UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
----------------------------------------------------------X
WILLIAM  J.  LOVELACE  and  OCTAVIA
LOVELACE,

                            Plaintiffs,                          **REPORT AND**
                                                                 **RECOMMENDATION**
                -against-                                        16 CV 4978 (ERK) (CLP)

SHOWROOM AUTO, LLC,

                            Defendant.
----------------------------------------------------------X

**POLLAK**, United States Magistrate Judge:

On September 7, 2016, plaintiffs William J. Lovelace and Octavia Lovelace ("plaintiffs")

commenced this action against Showroom Auto, LLC ("defendant" or "Showroom"), an automobile

dealer located on Long Island, New York, for alleged violations of the Truth in Lending Act ("TILA"),

15 U.S.C. §§ 1601, et seq., and New York's Deceptive Acts and Practices and False Advertising

statutes, General Business Law ("GBL") §§ 349 and 350.  (Compl.[1]  ¶¶ 2–4).

On November 3, 2016, plaintiffs moved, pursuant to Rule 55 of the Federal Rules of Civil

Procedure, for entry of default.  The Clerk of Court entered default on November 4, 2016.  On January

20, 2017, plaintiffs moved for default judgment.

While that motion was pending, defendant filed a cross motion on January 27, 2017, seeking to

vacate and set aside the default, pursuant to Rule 55 of the Federal Rules of Civil Procedure, on the

grounds that counsel for defendant could demonstrate excusable neglect in failing to respond to the

Complaint.  Defendant also cross moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss plaintiffs' Complaint because plaintiffs had entered into an agreement with

defendant which obligated the parties to arbitrate any disputes.  The Honorable Edward R. Korman

---

[1] Citations to "Compl." refer to the initial Complaint filed by the Lovelaces on September 7, 2016.

granted defendant's motion to vacate the default on February 6, 2017, and on April 12, 2017, referred the Cross Motion to Dismiss and/or Compel Arbitration to the undersigned to prepare a Report and Recommendation.

For the reasons set forth below, it is respectfully recommended that defendant's Cross Motion to Compel Arbitration and Motion to Dismiss be granted in part and denied in part.

## FACTUAL BACKGROUND

A.  Plaintiffs' Allegations as to the Hidden Car Fees

On April 7, 2017, Octavia Lovelace and her father, William Lovelace, went to defendant Showroom Auto to inquire about a 2014 Mercedes-Benz C Class they had seen listed online for $23,981.00. (Compl. ¶ 9).  Although Octavia Lovelace planned to be the primary driver of the vehicle, she did not qualify for financing.  (Id. ¶ 14).  Therefore, the buyer on the Retail Instalment Contract ("Contract") is listed solely as William Lovelace, not Octavia.  (Id. ¶ 16; Def.'s Mem.,[2] Ex. F). However, plaintiffs allege that defendant knew that Octavia would be making the car payments and would be the driver of the car.  (Compl. ¶ 13).

The Contract lists $33,180.00 as the total purchase price for the car.  (Compl. ¶ 17; Def.'s Mem., Ex. F).  On April 7, 2017, Octavia put down $10,000 toward the purchase price of the vehicle. (Compl. ¶ 12).  The parties also made arrangements to pay an additional $1,000 from Octavia's bank account toward the down-payment within two weeks of that date.  (Id. ¶ 15).  Plaintiffs allege that they did not receive a Buyer's Order for the vehicle and that William Lovelace was rushed through the signing of the Contract.  (Id. ¶¶ 21-22).

_____

[2] Citations to "Def.'s Mem." refer to the Memorandum of Law in Support of Defendant's Cross Motion to Vacate Default and to Dismiss Plaintiffs' Claim, filed by Showroom on January 30, 2017.

At the time of the sale, the Contract was assigned to Exeter Finance Corp., which has not been sued as a defendant in this action. (Def.'s Mem., Ex. F). Although the Contract listed a cash price of $33,180.00, and Octavia had already paid a total of $11,000 in a down-payment, immediately upon receiving the first invoice from Exeter, plaintiffs learned that the balance owed was $22,620.00 instead of the $22,180.00 that they had expected. (Compl. ¶ 23). This amount included an extended warranty and a fee for reconditioning the vehicle. (Id.) Plaintiffs allege that defendant had not disclosed the reconditioning fee and had not itemized the warranty agreement or service contract. (Id. ¶¶ 23–24).

Plaintiffs argue that Showroom Auto violated TILA by increasing the vehicle's purchase price based on William's credit. (Id. ¶ 26). They argue that by not itemizing certain costs, such as a service contract, within the itemization of the amount financed, defendant has also violated Section 359 of the GBL which prohibits deceptive acts in business, and Section 310 of the GBL which prohibits false advertising. (Id. ¶¶ 27, 29–32).

B.  Defendant's Response to the Claims

Defendant contends that this was an "ordinary used car transaction" which plaintiffs voluntarily executed. (Def.'s Mem. at 4). Defendant maintains that its online advertisement stated explicitly that "sales prices do not include Used Vehicle Recon. Fee, Prep, Tax & DMV Fees. See Dealer for details." (Merceus Decl.[3] ¶ 15, Ex. A). It also contends that its salesman advised plaintiffs that in addition to the basic sales price listed on the advertisement, the car was subject to this reconditioning fee, and indeed, Octavia Lovelace signed an acknowledgment that this fee was explained to her. (Id. ¶ 16, Ex. B).  Defendant alleges that the remainder of the sum charged to plaintiff was for a theft deterrent

---

[3] Citations to "Merceus Decl." refer to the Declaration of Bernard Merceus, dated January 27, 2017.

protection plan, a New York State Department of Motor Vehicles Registration Fee, and state sales tax. (Id. ¶ 19).

Defendant asserts that Octavia Lovelace's credit was "not sufficient to support a loan large enough to purchase the car so William Lovelace agreed to make the purchase in her place. The dealer's fee to arrange the financing was $1,340.00." (Pollack Decl.[4] ¶ 20). On the whole, defendant maintains that the transaction was "open and above board in all respects." (Id.)

C.  The Arbitration Clause

According to defendant, the Retail Instalment Contract entered into by plaintiffs sets forth the method by which the buyer and seller would litigate disputes. (Id. ¶ 13; Def.'s Mem., Ex. F). The Arbitration Provision is included on the last page of the six-page Contract, and is in its own box separated from the rest of the document language. (Id.) At the top of the box, the lettering is in bold, capital letters. (Merceus Decl. ¶¶ 25-26; Def.'s Mem., Ex. F). It states:

**ARBITRATION PROVISION**
**PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS.**

The subsequent provision notes that "either you or we may choose to have any dispute between us decided by arbitration and not in court or by jury trial." (Id.) It also provides that "discovery and rights to appeal in arbitration are generally more limited than in a lawsuit, and other rights that you and we would have in court may not be available in arbitration." (Id.; Pls.' Mem. at 7). The Provision continues:

> Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Agreement, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase, or condition of this vehicle, your purchase or financing contract or any resulting transaction or relationship

---

[4] Citations to "Pollack Decl." refer to the Declaration of Ira Pollack, dated January 27, 2017.

4

> (including any such relationship with third parties who do not sign your purchase or financing contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. . . .

(Id.)

On the third page of the Contract, directly above the signature lines for the buyer and seller, the bolded text reads as follows:

> **You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read both sides of this contract, including the arbitration provision on the reverse side, before signing below.**

(Def.'s Mem., Ex. F). Both William Lovelace and a representative for Showroom signed the Instalment Contract. Octavia Lovelace did not sign the document. (Id.).

Defendant seeks to enforce this arbitration provision of the Contract, arguing that the language requires arbitration as the parties' chosen dispute resolution method. (Def.'s Mem. at 8). Defendant also notes that federal policy strongly favors the enforcement of arbitration clauses in contracts. (Id. at 11).

Plaintiffs raise a number of issues in response. First, they contend that because Octavia did not sign any pages of the Contract, she cannot be compelled to arbitrate. (Pls.' Mem. at 2-3). Plaintiffs cite to a string of cases to argue that "the claims of Octavia Lovelace, who was not a signatory to the arbitration clause . . . should not be dismissed on account of those provisions." (Id. at n.5).

Second, plaintiffs argue that the arbitration clause is unenforceable because two of the other sales documents mention "court" as a dispute resolution forum. (Id. at 10). The purchase order provides that "in the event of litigation same shall be instituted only **in a court** of competent jurisdiction." (Id.; Merceus Decl. ¶ 10, Ex. E). Additionally, the Customer Acknowledgment form similarly provides that "in the event of litigation same shall be instituted only **in the court** . . . ."

(Def.'s Mem., Ex. M).  Plaintiffs argue that because the parties have entered into inconsistent dispute

resolution provisions, there has been no mutual assent to arbitrate.  (Pls.' Mem. at 9).

Finally, plaintiffs assert that even if the arbitration clause is enforceable in certain cases,

defendants did not properly elect arbitration in this case.  (Id. at 8).  Plaintiffs argue that "defendant

could have elected arbitration by either initiating an arbitration proceeding or by filing a motion under

§ 3 of the FAA to have this action stayed pending arbitration," but that, in this case, "it has done

neither."  (Id.)  Plaintiffs therefore argue that the Court should decline to compel arbitration.

DISCUSSION

I.    <u>Enforceability of Arbitration Agreement</u>

    A.  <u>Legal Standard</u>

In order to determine whether a claim should be submitted to arbitration, courts generally

assess 1) whether the parties had an agreement to arbitrate; 2) the scope of that agreement; 3) whether

Congress intended the asserted claims to be nonarbitrable; and 4) whether to stay the balance of the

proceedings pending arbitration if some, but not all, of the claims are subject to arbitration.  Guyden v.

Aetna, 544 F.3d 376, 382 (2d Cir. 2008).

The Supreme Court and the Second Circuit have generally enforced agreements to arbitrate,

noting that there is a strong federal policy in favor of promoting arbitration consistent with legislative

intent.  The Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), provides that "[a] written provision .

. . to settle by arbitration . . . shall be valid, irrevocable, enforceable, save upon such grounds as exist at

law or in equity for the revocation of any contract."  9 U.S.C. § 2.  See AT&T Mobility v. Concepcion,

563 U.S. 33, 344-45 (2011); Arciniaga v. General Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006).

The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that

district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration

6

agreement has been signed." Genesco v. T. Kakiuchi, 815 F.2d 840 (2d Cir. 1987) (citations and quotations omitted). Based on this strong federal policy, a broad agreement to arbitrate creates a presumption of arbitrability which may only be overcome by "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 395 (2d Cir. 2015) (quoting Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, 198 F.3d 88, 99 (2d Cir. 1999).

### B.  Arbitrability of TILA and GBL Claims

As an initial matter, neither party appears to dispute that TILA claims or claims under the GBL are arbitrable.

#### 1)  TILA Claims

The purpose of the Truth in Lending Act ("TILA") is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available . . . and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. To accomplish this goal, TILA requires creditors to disclose certain information and in a particular manner. TILA requires a "lender or creditor to provide 'a written itemization of the amount financed,' including 'each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person.'" Pierre v. Planet Automotive, 193 F. Supp. 3d 157, 164 (E.D.N.Y. 2016) (internal citations omitted).

According to the regulations implementing the TILA, a finance charge is "imposed directly or indirectly by the financial institution either as an incident to or as a condition of an extension of consumer credit," not including any charge of a type payable in a comparable cash transaction (such as

taxes, title, licenses or registration fees).  12 C.F.R. § 226.4(a).  (See also Pls.' Mot. Def. J. at 8).[5]

Since this finance charge could be hidden in the total cost charged to a consumer, TILA "requires clear

and accurate disclosures by creditors to consumers of any finance charge that the consumer will bear

under the credit transaction."  Diaz v. Paragon Motors, 424 F. Supp. 2d 519, 529 (E.D.N.Y. 2006); see

also 15 U.S.C. § 1638(a)(4).

    As "numerous courts have found TILA claims to be arbitrable," plaintiffs do not dispute that

the underlying TILA claims are arbitrable.  See In re Currency Conversion Fee Antitrust Litig., 265 F.

Supp. 2d 385, 408 (S.D.N.Y. 2003) (citing cases).


### 2)  GBL Sections 349 and 350

    Similarly, claims under Sections 349 and 350 of the New York GBL may be resolved through

arbitration.  See Kuehn v. Citibank, No. 12 CV 3287, 2012 WL 6057941, at *5 (S.D.N.Y. Dec. 6,

2012).

    New York GBL §§ 349 and 350 broadly prohibit "deceptive acts or practices in the conduct of

any business, trade or commerce or in the furnishing of any service in this state . . ." N.Y. Gen. Bus.

Law § 349 (a).  Deceptive acts are defined as those that are "likely to mislead a reasonable consumer

acting reasonably under the circumstances."  Horowitz v. Stryker Corp., 613 F. Supp. 2d 271, 286

(E.D.N.Y. 2009) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A.,

85 N.Y.2d 20, 26, 647 N.E.2d 741, 745, 623 N.Y.S.2d 529, 533) (1995).

    Similar to the TILA claim described above, plaintiffs do not argue that GBL claims are not

arbitrable.  Instead, they oppose arbitration on the grounds that they did not agree to arbitrate, and

contend that, therefore, defendant's motion to compel arbitration should be denied.

---

[5] Citations to "Pls.' Mot. Def. J." refer to Plaintiffs' Memorandum of Law in Support of Motion for Judgment on Default, filed January 20, 2017.

C. <u>Whether the Parties Agreed to Arbitrate</u>

In determining whether the parties agreed to arbitrate this dispute, the Court looks to the language of the Contract at issue and applies ordinary state contract law. <u>See</u> <u>First Options of Chicago v. Kaplan</u>, 514 U.S. 938, 939 (1995). This is because arbitration itself is "a matter of contract." <u>Rent-A-Center, West v. Jackson</u>, 561 U.S. 63, 65 (2010). Thus, general contract provisions govern the enforceability of the arbitration agreement, and, similarly, contract defenses such as fraud can serve as a defense. <u>Id.</u> (citing <u>Doctor's Assocs., Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996)).

1) <u>William Lovelace</u>

a) <u>Agreement to Arbitrate</u>

Looking to the language of the Instalment Contract, on the top of the first page of the Contract, directly underneath the title "Retail Instalment Contract," there appears the language "Simple Finance Charge **(With Arbitration Provision)."** (Def.'s Mem., Ex. F) (emphasis added).

The actual Arbitration Provision is set forth on page 6 of the Contract. It unequivocally provides that either party "may choose to have any dispute between us decided by arbitration and not in court or by jury trial." (Def.'s Mem., Ex. F). Not only does this language appear delineated in its own separate box and highlighted by a bolded capitalized title — **"ARBITRATION PROVISION – PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS"** — but it is followed by a second reference on the third page of the agreement reminding buyers that they agree to the terms of the Contract, and that they have read both sides of the Contract, including the arbitration provision on the reverse side. This language: "you acknowledge that you have read both sides of this contract, including the arbitration provision on the reverse side, before signing below," appears directly above the signature lines of the Contract. In this case, William Lovelace signed the Contract. (<u>Id.</u>)

9

Thus, the language of the Contract clearly sets forth the Arbitration clause; it is not hidden or concealed in tiny typeface that a buyer might not see.

### b)   Scope of Arbitration Agreement

Moreover, the scope of the arbitration language is extremely broad, encompassing "any claim or dispute, whether in contract, tort, statute or otherwise," arising out of or relating to the "credit application, purchase, or condition of" the vehicle. (Id.) It also includes the interpretation of the arbitration clause itself and "the arbitrability of the claim or dispute." (Id.)

In reviewing the same boilerplate arbitration language that it is in this Contract, this Court, in a prior case, noted the breadth of the agreement and concluded that TILA claims are covered by it. See Cho v. JS Autoworld, 97 F. Supp. 3d 351 (E.D.N.Y. 2015). The Court in Cho highlighted the language that "**any claim or dispute**. . . (including the interpretation and scope of this Arbitration Agreement, and the arbitrability of the claim or dispute) . . . shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action" (emphasis added). Id. at 357. In the Cho court's view, this "broad scope" "clearly encompasse[d]" the plaintiff's underlying TILA claims. Id.

In light of the broad language of the Contract, the Court finds that the agreement to select arbitration "clearly encompassed" the claims raised by plaintiffs' Complaint, including the TILA and GBL claims.

### c)   Lack of Signature

Neither party has raised a concern that the parties did not sign the separate "agreement to arbitrate." The agreement to arbitrate that appears in a box in the upper right hand corner of the Contract on page 3 contains its own signature lines, in addition to the signature lines that appear on page 6 at the end of the Contract. (See Def.'s Mem., Ex. F). This agreement to arbitrate reads: "By

signing below, you agree that, pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate." (Id., Ex. F). While William Lovelace signed the Contract on page 6, the signature lines in this box have been left blank. (Id.)

Nonetheless, even if the parties (presumably plaintiffs) had raised the argument that the agreement to arbitrate was invalid because they did not sign this provision, courts have held that, in order for an arbitration provision to be valid, there need only be proof that the parties intended to be bound by such an agreement; a signature is not required. See Cho v. JS Autoworld, 97 F. Supp. 3d at 356 (holding that "indeed, even if the Agreement had not been signed by either party, the Court could still find that a valid arbitration agreement existed") (quoting BeautyKo v. Fedex, No. 14 CV 0037, 2015 WL 224361, at *3 (S.D.N.Y. Jan. 16, 2015)). Furthermore, the court in Cho recently held that "[w]hile the FAA mandates that arbitration agreements be in writing, it does not require that they be signed." Cho v. JS Autoworld, 97 F. Supp. 3d at 356. This principle is reflected in New York's arbitration statute, which simply requires a "written agreement" to submit a controversy to arbitration; it does not require that this agreement be signed. See N.Y. C.P.L.R. § 7501.

### d) Inconsistent Dispute Resolution Provisions

#### i. The Parties' Arguments

Plaintiffs contend that because there are "inconsistent dispute-resolution provisions, there has been no mutual assent to arbitrate." (Pls.' Mem. at 9) (citing NAACP of Camden County East v. Foulke Management Corp. ("Foulke"), 421 N.J. Super 404, 24 A.3d 777 (N.J. Super. Ct. App. Div. 2011)). Plaintiffs rely on the court's decision in Foulke, where the contract documents at issue contained different arbitration clauses, each having various rules about the nature and location of the

11

arbitration forum, inconsistent provisions about the time limit in which arbitration must be initiated, and assorted descriptions of the costs of arbitration. 421 N.J. Super at 431, 24 A.3d at 794. The court found that "viewed in their totality, the arbitration provisions scattered among the [different contract documents] are too plagued with confusing terms and inconsistencies to put a reasonable consumer on fair notice of their intended meaning." Id.

Plaintiffs argue that the documents in this matter contain similar inconsistencies, with the Retail Instalment Contract requiring arbitration but the other documents referring to resolution of disputes in "court." Specifically, plaintiffs point to the mention of "a court" in the third paragraph of the Customer Acknowledgment, which reads: ". . . in the event of litigation same shall be instituted only **in the court** at 89-17 Sutphin Blv, Jamaica, New York . . . ." (Def.'s Mem., Ex. M) (emphasis added). Plaintiffs also note that the Vehicle Purchase Agreement refers to litigation in a "**court** of competent jurisdiction." (Def.'s Mem., Ex. F) (emphasis added). They contend that these two provisions in the Acknowledgment and in the Vehicle Purchase Agreement render the arbitration clause in the Retail Instalment Contract too confusing and therefore unenforceable.

### ii. Analysis

In considering the plaintiffs' arguments, the Court notes first that Foulke is an out-of-state decision interpreting New Jersey law and is not binding on this case for a variety of reasons. First, the facts of the case are distinguishable from the ones at hand. In this case, unlike in Foulke, there is only one arbitration provision appearing in the Retail Instalment Contract, and its terms are clear. While the Customer Acknowledgment form summarizes provisions from the other documents, including a provision about the conditions for recovering possession of the car, the customer's responsibility to insure the vehicle, and the responsibility of the customer if the check bounces, it contains no mention of arbitration. Moreover, while the Acknowledgment form contains a choice of law provision and

provides that "litigation as per the terms of this agreement" shall be instituted in a specific state court, the reference to "this agreement" indicates an intention to have disagreements related to the Customer Acknowledgment form litigated in state court.[6] In this case, the claims at issue arise under the Retail Installment Contract, not the Customer Acknowledgment agreement.[7]

### e) Effect of Assignment

Plaintiffs note that the Instalment Contract was assigned by defendant to a third party, Exeter Finance Corp. They argue that because the Instalment Contract is the only document that refers to the arbitration clause, and Showroom Auto is no longer a party to the Contract, having assigned it to Exeter, the forum selection clauses in the other documents should govern this dispute. (Pls.' Mem. at 13).

However, the arbitration clause in the Contract specifies that it covers any dispute "between you and us or our employees, agents, successors or **assigns**, which arises out of or relates to your credit application, purchase, or condition of this vehicle, this contract or any resulting transaction or relationship (**including any such relationship with third parties who do not sign this contract**) . . . " (Def.'s Mem., Ex. F.) (emphasis added). The clause continues: "This Arbitration Provision shall survive any termination, payoff or **transfer** of this contract." (emphasis added).

---

[6] This Court need not assess the validity of the Customer Acknowledgment agreement here, since the disagreement at issue does not arise under it. However, the Court notes that the last paragraph of the Customer Acknowledgment contains a sentence that the "parties [to] this agreement . . . waive all right to a trial by jury in any proceeding, action or counterclaim." (Def.'s Mem., Ex. M).

[7] As discussed supra, this Court notes that TILA is a disclosure rule requiring clear and conspicuous disclosures, in meaningful sequence, in writing, and in a form the consumer may keep. See 15 U.S.C. § 1637. While a plaintiff need not have been provided a form to bring a TILA violation suit, in this case, it seems clear that plaintiffs' TILA claims arise out of the form they were given; they do not argue that they were not given the disclosures at all.

13

Even though the Contract was assigned to Exeter the same date it was signed, the Court finds that the arbitration provision survived such assignment. The Arbitration Agreement, therefore, is valid as between the Lovelaces and Showroom, as well as the Lovelaces and Exeter; any of the parties could seek to enforce it, as Showroom has in this case.

f) <u>Fraud</u>

Although plaintiffs do not expressly allege fraud and misrepresentation, they claim that William was "rushed" to sign the Contract, implying that he was somehow misled or did not become aware of the Contract's terms. (Compl. ¶¶ 21–22). Under New York law, a plaintiff claiming fraud in the course of a contract must prove, by clear and convincing evidence, a material misrepresentation or omission of fact made knowingly by the defendant with the intent to defraud, the plaintiff's reasonable reliance, and the resulting damage. <u>See, e.g.</u>, <u>Bank of America v. Bear Stearns</u>, 969 F. Supp. 2d 339 (S.D.N.Y. 2013); <u>see also</u> <u>Ramirez v. Nat'l Coop Bank</u>, 91 A.D.3d 204, 989 N.Y.S.2d 280 (2011) (finding that plaintiff stated a cause of action for fraud when plaintiff, an "uneducated Spanish-speaking Honduran immigrant on disability and food stamps," was led to a dealership through "false promises of a cash prize or a free cruise," and proceeded to sign paperwork, written only in English, to buy three cars). In the Lovelace's case, there are no facts alleged suggesting that defendant made a misrepresentation or omitted any information relevant to the arbitration agreement that would induce them sign the agreement in reliance thereof. There are also no facts indicating that William has a low level of education or speaks a language other than English that might make him more potentially vulnerable for exploitation in reviewing a contract. The record is devoid of any facts that would suggest fraud or misrepresentation in the signing of the Contract or in the arbitration provisions generally.

14

Thus, while the record mentions that William was "rushed," without any other indicators of fraud, there is no basis on which to conclude that there was bad faith or fraud involved here.

### g) Defendant Failed to Commence Arbitration

Plaintiffs argue that there is a procedure that defendant failed to follow in order to elect arbitration. (Pls.' Mem. at 7). They maintain that defendant has not followed the proper procedure to elect arbitration, relying on the language within the arbitration clause providing that "either you or we may **choose** to have any legal dispute decided by arbitration . . ." as well as the subsequent sentence, "any claim or dispute . . . shall, at your or our **election** . . ." (Def.'s Mem., Ex. F). As discussed supra, plaintiffs argue that "defendant could have elected arbitration by either initiating an arbitration proceeding or by filing a motion under § 3 of the FAA to have this action stayed pending arbitration," but that, in this case, "it has done neither."

In citing § 3 of the FAA, however, plaintiffs fail to cite the very next section, 9 U.S.C. § 4, which specifically provides: "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The statutory language itself thus specifically provides that a party may request arbitration of its claims when parties have agreed in writing to arbitrate and one party has instead filed its claims in a court.

In light of the above, this Court respectfully recommends a finding that defendant's procedure to compel arbitration as to William Lovelace is appropriate.

15

2) Octavia Lovelace

The same principles apply to Octavia Lovelace, even though she did not sign the arbitration provision. The Second Circuit has "made clear that a nonsignatory party may be bound to an arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" Thomson-CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995) (quoting McAllister Bros., Inc. v. A&S Transp. Co., 621 F.2d 519, 524 (2d Cir. 1980)). This Circuit has recognized five theories for binding nonsignatories to arbitration agreements:  1) incorporation by reference; 2) assumption; 3) agency; 4) veil-piercing/alter ego; and 5) estoppel.  Id. at 776; see also Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 631 (2009) (explaining that "'traditional principles' of state law allow a contract to be enforced by or against nonparties through 'assumption, piercing the corporate veil, alter ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel'"). A party "is estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from the contract containing an arbitration clause." American Bureau of Shipping v. Tencara Shipyard, 170 F.3d 349, 353 (2d Cir. 1999) (finding estoppel where a shipyard's contract with a safety and design classification organization led to a "direct benefit" for the non-signatory owners, namely, lower insurance rates and the ability to sail under a foreign flag); see also LaRoss Partners v. Contact 911, 874 F. Supp. 2d 147 (E.D.N.Y. 2012) (defining "direct" benefits as ones that "flow directly from the agreement" and "indirect" benefits as "incidental to the contract," occurring when the "non-signatory benefits from the contractual relationship between the signatories but not the contract itself"). In this case, Octavia Lovelace has received a "direct benefit" from the Retail Instalment Contract – namely, the financing for, and ultimately the use of, the car.

The cases relied on by plaintiffs on this issue differ from the one at hand. In those cases, there were multiple unrelated plaintiffs suing the same defendants on different contracts. See, e.g., Lafayette Texaco, Inc. v. Smith, No. 08 CV 406, 2010 WL 653494, at *4 (M.D. Ala. Feb. 19, 2010); Midwest

16

Financial Holdings, LLC v. P&C Ins. Systems, Inc., No. 07-3156, 2007 WL 4302436, at *4 (C.D. Ill. Dec. 7, 2007). Some of the contested contracts between the plaintiffs and the defendants contained arbitration provisions while others did not. Id. The Lafayette and Midwest courts compelled arbitration for some, but not all, of the plaintiffs in those cases depending on what their contracts provided. See Lafayette Texaco, Inc. v. Smith, 2010 WL 653494, at *4 (finding that "although it makes perfect sense, in terms of judicial economy, to arbitrate all of the plaintiffs' claims together because they bring identical claims" against the defendant, because two of the plaintiffs each had their own distinct contracts with the defendant, the defendant was "entitled to arbitrate with only the [plaintiffs] that agreed to do so in contract"); Midwest Financial Holdings, LLC v. P&C Ins. Systems, Inc., 2007 WL 4302436, at *4 (compelling arbitration for one of the plaintiffs and the defendant based on their signed licensing agreement, but denying defendant's motion to compel arbitration where the other plaintiffs did not have a similar agreement).

In this case, on the other hand, both William and Octavia Lovelace's claims emerge from the same contract. Thus, because Octavia received a direct benefit from the Instalment Contract and her claims in this action, like William's claims, arise from this same Instalment Contract, the Court respectfully recommends that Octavia Lovelace be compelled to arbitrate her claims as well. An arbitration agreement must be enforced "notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc., 942 F. Supp. 757, 760 (D. Conn. 1996) (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr., 460 U.S. 1, 20, 103 (1983)).

Accordingly, for the reasons set forth above, the Court respectfully recommends that defendant's motion to compel arbitration be granted as to both plaintiffs.

II.    Motion to Dismiss

Defendant moves to dismiss the plaintiffs' claims in favor of arbitration, but plaintiffs argue

that a stay is appropriate. (Def.'s Mem. at 13–14; Pls.' Mem. at 9). The Second Circuit recently

clarified that in the case of a motion to dismiss based on an agreement to arbitrate, courts should grant

a mandatory stay pending arbitration instead of granting the motion to dismiss. Katz v. Cellco

Partnership, 794 F.3d 341, 346 (2d Cir. 2015). A mandatory stay enables parties to "proceed to

arbitration directly, unencumbered by the uncertainty and expense of additional litigation, and

generally precludes judicial interference until there is a final award." Id. at 346. The text of the FAA

itself provides that "upon any issue referable to arbitration under an agreement in writing for such

arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in such

suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the

parties stay the trial of the action until such arbitration has been had in accordance with the terms of

the agreement." 9 U.S.C. § 3; see generally Carvant Fin. LLC v. Autoguard Advantage Corp., 958 F.

Supp. 2d 390, 398 (E.D.N.Y. 2013) (applying Section 3 of the FAA).

Since the TILA claims confer subject matter jurisdiction on this court, it is respectfully

recommended that the action be stayed and that the court retain jurisdiction over this matter for the

limited purpose of reviewing the arbitration award.[8]

---

[8] Defendant asks this Court to transfer the matter to state court per the Vehicle Purchase Agreement and the
Customer Acknowledgment form if the Court does not compel arbitration. (Def.'s Mem. at 1). However, since
the Court in this case does compel arbitration, the Court need not address defendant's alternative arguments for
transferring the matter to state court.

CONCLUSION

In light of the foregoing, the Court respectfully recommends that Showroom's motion to compel arbitration be granted as to both plaintiffs. It is further recommended that the Court issue a stay pending the outcome of the arbitration. The Court respectfully recommends that the defendant's motion to dismiss plaintiffs' claims be denied without prejudice at this time.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onondaga Cty, 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated:  Brooklyn, New York
         September / 8 2017

                                        /s/  Cheryl Pollak
                                        Cheryl L. Pollak
                                        United States Magistrate Judge
                                        Eastern District of New York