# Exhibit 1



AMERICAN ARBITRATION ASSOCIATION®

**DEMAND FOR ARBITRATION
CONSUMER ARBITRATION RULES**

| 1. Which party is sending the filing documents to the AAA? *(check one)* ☑ Consumer ☐ Business |
|---|

2. Briefly explain the dispute (include additional sheets or forms as needed).

See attached Complaint. Claims against Respondent under the Truth in Lending Act, under New York General Business Law §§ 349 and 350, and for common law fraud.

☐

| 3. Specify the amount of money in dispute, if any: $ To be determined. | 4. State any other relief you are seeking: ☑ Attorneys Fees ☑ Interest ☑ Arbitration Costs ☐ Other; explain below: |
|---|---|

5. Identify the requested city and state for the hearing if an in-person hearing is to be held: IN-PERSON HEARING IN MANHATTAN, NY

6. Complete all information regarding both the Consumer and the Business. Attach additional sheets or forms as needed.

| **Consumer:** | **Business:** |
|---|---|
| Name: William J. Lovelace and Octavia Lovelace | Name: Showroom Auto, LLC |
| Address: 133-14 142nd Street, 2nd Floor | Address: 42-08 35th Avenue |

| City: South Ozone | State: NY | Zip Code: 11436 | City: Long Island City | State: NY | Zip Code: 11101 |
|---|---|---|---|---|---|
| Telephone: | Fax: | | Telephone: 718-349-9600 | Fax: 718-349-9610 | |

| Email Address: | Email Address: |
|---|---|
| **Consumer's Representative (*if known*):** | **Business' Representative (*if known*):** |
| Name: Brian L. Bromberg | Name: Ira B. Pollack |
| Firm: Bromberg Law Office, P.C. | Firm: Ira B. Pollack & Associates, PLLC |
| Address: 26 Broadway, 21st Floor, Suite 10004 | Address: 118-35 Queens Boulevard |

| City: New York | State: NY | Zip Code: 10004 | City: Forest Hills | State: NY | Zip Code: 11375 |
|---|---|---|---|---|---|
| Telephone: (212) 248-7906 | Fax: (212) 248-7908 | | Telephone: 718-261-2700 | Fax: 718-709-0071 | |

| Email Address: brian@bromberglawoffice.com | Email Address: irabpollack@yahoo.com |
|---|---|
| Signature*: *[signature]* Date: 10/19/2017 | Signature*: Date: |

\* Signatures are required from each party for Submission to Arbitration when the parties' contract has no arbitration clause, or the arbitration clause does not provide for arbitration by the AAA or under its Rules, or a court order does not name the AAA or its Rules, or if there is no contract.

**7. Send a copy of the completed form to the AAA together with:**

- A clear, legible copy of the contract;
- The proper filing fee (see Costs of Arbitration section of the Consumer Arbitration Rules); and
- A copy of the court order, if arbitration is court-ordered.

**8. Send a copy of the completed form and contract to all parties.**

**9. Retain a copy of the form and all filing documents for your records.**

Cases may be filed with the AAA by mail, facsimile, email, or online. To file by mail send the initial filing documents and filing fee to AAA Case Filing Services, 1101 Laurel Oak Road, Suite 100, Voorhees, NJ 08043. To file via fax send the initial filing documents and a completed charge card authorization form for the filing fee to 877-304-8457. To file by email send the filing documents and a completed charge card authorization form for the filing fee to CaseFiling@adr.org. To file online via AAA WebFile, visit www.adr.org and click on File & Manage a Case. Filing forms are available at www.adr.org or by calling Customer Service at 1-800-778-7879. When filing electronically no hard copies are required.

**Additional Consumer's Representative:**

Daniel S. Blinn
Consumer Law Group, LLC
35 Cold Spring Road, Suite 512
Rocky Hill, CT 06067
Telephone: (860) 571-0408
Fax: (860) 571-7457
Email:  dblinn@consumerlawgroup.com; lminer@consumerlawgroup.com

# Exhibit A

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| WILLIAM J. LOVELACE and | : | NO. 16-CV-4978 |
| OCTAVIA LOVELACE | : | |
| Plaintiffs, | : | |
| | : | JURY DEMANDED |
| v. | : | |
| | : | |
| | : | |
| SHOWROOM AUTO, LLC | : | |
| Defendant | : | |
| | : | |

### COMPLAINT

### I.  INTRODUCTION

1.    This is a suit brought under the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.*, and the New York General Business Law ("GBL") §§ 349 and 350.

### II.  PARTIES

2.    Plaintiff William J. Lovelace ("William") is a consumer and natural person residing in South Ozone Park, New York.

3.    Plaintiff Octavia Lovelace ("Octavia") is a consumer and natural person residing in South Ozone Park, New York. She is William's daughter.

4.    Defendant Showroom Auto is a New York corporation that operates an automobile dealership in Long Island City, New York.

### III.  JURISDICTION AND VENUE

5.    This Court has subject matter jurisdiction under 15 U.S.C. § 1640(e) and 28 U.S.C. § 1331.

6.     This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

7.     This court has jurisdiction over Showroom Auto because it is a New York entity that regularly conducts business in this state.

8.     Venue in this court is proper because the claims involve a transaction that occurred in this district.

## IV. FACTUAL ALLEGATIONS

9.     On or about April 7, 2016, Octavia saw an advertisement on Showroom Auto's website and www.usedcarsgroup.com for a 2014 Mercedes Benz C300 (the "Vehicle") for a price of $23,981.

10.     After contacting Showroom Auto to confirm that the Vehicle was still available, Octavia and her father, William, travelled to the dealership and met with a Showroom Auto salesman.

11.     Octavia discussed the Vehicle with Showroom Auto personnel, who confirmed that the cash price of the Vehicle was $23,981.

12.     Octavia told Showroom Auto that she had $10,000 to put down for the purchase of the Vehicle.

13.     Showroom Auto suggested to Octavia that the car be put in only William's name due to Octavia's credit, but Showroom Auto knew and understood that Octavia would be the primary driver and would be making payments for the Vehicle.

14.   The salesman at Showroom Auto told Octavia that she did not get approved for financing, but William had been approved, and they would need to put an additional $1,000 down.

15.   Octavia did not have an additional $1,000 at the time of purchase, and Showroom Auto agreed to accept the payment in two weeks, and provided Octavia with a form to sign that permitted Showroom Auto to take the additional $1,000 from Octavia's bank account in two weeks.

16.   Showroom Auto prepared a Retail Instalment Contract (the "Contract) that listed William as the Buyer and did not contain a Co-Buyer, even though it knew that Octavia would be making the payments under the Contract.

17.   The Contract listed a cash price of $33,180.00, including $2,704 in sales tax, an amount that was substantially in excess of the advertised price.

18.   Upon information and belief, Showroom Auto increased the price of the Vehicle because Exeter Financial is a subprime finance company that imposed costs upon Showroom Auto in order to take assignment of the Contract or otherwise did not pay the full amount financed at the time of assignment.

19.   The Contract provided for an amount financed of $22,620, an annual percentage rate of 16.70%, a total finance charge of $15,462.96, and provided for 72 monthly payments of $528.93 commencing May 22, 2016.

20.   The Contract was assigned to Exeter Finance Corp. ("Exeter").

21.   Showroom Auto rushed William through the signing of the Contract, and he did not notice that the price being charged was substantially in excess of the agreed upon price and that the amount financed was $22,620.

22.   Showroom Auto failed to provide Octavia or William with a copy of a Buyers Order for the Vehicle.

23.   After receiving the first Exeter invoice and learning that the balance owed was $22,620, Octavia contacted Showroom Auto's general manager, Chris, who claimed that the price included a service contract and an "extended warranty" and a fee for "reconditioning" the Vehicle, although no reconditioning fee had been disclosed by Showroom Auto and no warranty agreement or service contract had been itemized on the Contract or provided to the Plaintiffs.

24.   If a service contract was registered in this transaction, this occurred without Plaintiffs' knowledge, and no service contract has been provided them.

## V.   CAUSES OF ACTION

### A.  TRUTH IN LENDING ACT

25.   Plaintiffs restate, reallege, and incorporate herein by reference all foregoing paragraphs as if set forth fully in this Count.

26.   Showroom Auto violated TILA by increasing the purchase price of the Vehicle on account of William's credit and by charging him more money than he would have in a cash transaction.

27. Additionally, if a service contract was included, Showroom Auto violated TILA by not separately itemizing the cost of the service contract within the itemization of the amount financed that it provided to William.

28. Alternatively, if a service contract was included, Showroom Auto violated TILA by requiring William to charging him the cost of that undelivered contract as a condition of financing.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant Showroom Auto for actual damages, plus additional damages of $2,000 plus, attorney fees and costs.

## B. NEW YORK GENERAL BUSINESS LAW §§ 349 AND 350

29. Plaintiffs restate, reallege, and incorporate herein by reference all foregoing paragraphs as if set forth fully in this Count.

30. Under New York General Business Law ("GBL") § 349, deceptive acts or practices in the conduct of any business conducted in the State of New York are unlawful.

31. Under GBL § 350, "False advertising in the conduct of any business, trade or commerce or in the furnishing of any service is hereby declared unlawful."

32. Showroom Auto's failure or refusal to sell the Vehicle for its advertised price is a violation of the GBL §§ 349 and 350, and it has caused Plaintiffs to suffer an ascertainable loss of money or property in that they paid more for the Vehicle, and became indebted to a greater extent, than if they had been charged only the advertised price.

33.    Additionally, William signed the Contract and agreed to be liable for the payments for Octavia's Vehicle without compensation, and he is a "Co-Signor" within the meaning of the Federal Trade Commission's Credit Practices Rule, 6 C.F.R. § 444.3.

34.    Showroom Auto violated the GBL when it obligated William without first informing him of the nature of his liability as co-signor, in violation of C.F.R. § 444.3(a)(2).

35.    Showroom Auto violated the GBL when it did not provide William with a copy of the Notice to Co-Signor required by 16 C.F.R. § 444.3(c).

36.    Showroom Auto further violated the New York General Business Law ("GBL") § 349 by failing to provide Plaintiff with the Buyers Order, Buyer's Guide and other contract documents for at the time he signed the Contract.

37.    By and through its acts, omissions, concealments, and misrepresentations, Defendant violated GBL §§ 349 and 350 with false and deceptive advertising and with materially misleading and consumer-oriented deceptive acts and practices, with a broad impact on consumers at large, and did so knowingly or willfully.

38.    Plaintiffs relied upon the false and deceptive advertising.

WHEREFORE, Plaintiffs respectfully request that judgment be entered against Defendant Showroom Auto for their damages, for civil penalties, for punitive damages, and for treble damages of up to $1,000, and attorney fees and costs.

## C.    COMMON LAW FRAUD

39.    Plaintiffs restate, reallege, and incorporate herein by reference all foregoing paragraphs as if set forth fully in this Count.

40.    Showroom Auto's agents intentionally, recklessly and/or negligently made misrepresentations to Plaintiffs regarding the price of the Vehicle and the amount they would be financing to purchase the Vehicle.

41.    Showroom Auto's agents negligently, willfully, intentionally and/or recklessly concealed from the Plaintiffs the fact that the Vehicle was going to be considerably costlier to them than was represented, and that it had created a contract containing more expensive terms than had been agreed to.

42.    Showroom Auto then assigned the contract with an inflated price to Exeter and, based upon that assignment, arranged with the New York Department of Motor Vehicles to issue a title that reflected a lien in favor of Exeter.

43.    That in reliance on Showroom Auto's false representations as set forth in the foregoing paragraphs, Plaintiff William Lovelace entered into a financing contract with Showroom Auto.

44.    Without Showroom Auto's false representations, Plaintiff William Lovelace would not have entered into the financing contract with Showroom Auto.

45.    Plaintiff William Lovelace has been actually damaged by Showroom Auto's false representations by receiving an automobile loan at a higher price for the Vehicle and amount financed than what William and Octavia Lovelace agreed to in negotiating the Contract.

46.     Plaintiff William Lovelace has also been actually damaged by Showroom Auto's assignment of the contract to Exeter and by causing a lien with a grossly inflated price to be placed in Exeter's name.

47.     Plaintiff William Lovelace relied on Showroom Auto's misrepresentations and were induced to purchase the aforementioned automobile.

48.     Plaintiff Octavia Lovelace was also damaged by these false representations, because – as Defendant was aware – William Lovelace was buying the Vehicle in his name at Defendant's suggestion and Octavia Lovelace is responsible for making the monthly payments on his behalf.

49.     As a result of the aforementioned conduct, Plaintiffs suffered damages.

50.     Showroom Auto's actions as hereinbefore described were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor against Showroom Auto as follows:

(A)     Actual damages;

(B)     Punitive damages;

(C)     Attorney fees, litigation expenses, and costs incurred in bringing this action; and

(D)     Any other relief this Court deems appropriate and just under the circumstances.

## JURY DEMAND

Plaintiffs respectfully request a trial by jury.

Dated:          September 7, 2016


                              PLAINTIFFS, WILLIAM J. LOVELACE
                              And OCTAVIA LOVELACE


                              By: /s/ *Brian L. Bromberg*
                                   Brian L. Bromberg
                                   One of Plaintiffs' Attorneys


**Attorneys for Plaintiff**

Daniel S. Blinn
Consumer Law Group, LLC
35 Cold Spring Rd. Suite 512
Rocky Hill, CT  06067
Tel: (860) 571-0408

Brian L. Bromberg
Jonathan R. Miller
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
Tel: (212) 248-7906

Exhibit B

# RETAIL INSTALMENT CONTRACT
## SIMPLE FINANCE CHARGE (WITH ARBITRATION PROVISION)

Dealer Number _____    Contract Number _____

| Buyer Name and Address (Including County and Zip Code) | Co-Buyer Name and Address (Including County and Zip Code) | Seller-Creditor (Name and Address) |
|---|---|---|
| GILDAH J LOVELACE 13314 142ND STREET 2ND FL SOUTH OZONE PARK NY 11436 | | SHOWROOM AUTO, LLC 42-08 35TH AVE LONG ISLAND CITY, NY 11101 |

You, the Buyer (and Co-Buyer, if any), may buy the vehicle below for cash or on credit. By signing this contract, you choose to buy the vehicle on credit under the agreements on the front and back of this contract. You agree to pay the Seller - Creditor (sometimes "we" or "us" in this contract) the Amount Financed and Finance Charge according to the payment schedule below. We will figure your finance charge on a daily basis. The Truth-In-Lending Disclosures below are part of this contract.

| New/Used/Demo | Year | Make and Model | Vehicle Identification Number | Primary Use For Which Purchased |
|---|---|---|---|---|
| USED | 2014 | ME/BE C300 AWD | WDDGF8AB6EA689793 | Personal, family, or household unless otherwise indicated below ☐ business ☐ agricultural |

## FEDERAL TRUTH-IN-LENDING DISCLOSURES

| ANNUAL PERCENTAGE RATE The cost of your credit as a yearly rate. | FINANCE CHARGE The dollar amount the credit will cost you. | Amount Financed The amount of credit provided to you or on your behalf. | Total of Payments The amount you will have paid after you have made all payments as scheduled. | Total Sale Price The total cost of your purchase on credit, including your down payment of $ 11,000.00 is |
|---|---|---|---|---|
| 16.70 % | $ 15,462.96 | $ 22,620.00 | $ 38,082.96 | $ 49,082.96 |

(e) means an estimate

### Your Payment Schedule Will Be:

| Number of Payments | Amount of Payments | When Payments Are Due |
|---|---|---|
| 72 | 528.93 | Monthly beginning 05/22/2016 |

Or As Follows:

**Late Charge.** If payment is not received in full within __10__ days after it is due, you will pay a late charge of $ __1.00__ or __5__ % of the part of the payment that is late, whichever is __greater__.
**Prepayment.** If you pay off all your debt early, you will not have to pay a penalty.
**Security Interest.** You are giving a security interest in the vehicle being purchased.
**Additional Information:** See this contract for more information including information about nonpayment, default, any required repayment in full before the scheduled date and security interest.

### ITEMIZATION OF AMOUNT FINANCED

| | | |
|---|---|---|
| 1 Cash Price (including $ 2,704.00 sales tax) | | $ 33,180.00 (1) |
| 2 Total Downpayment = | | |
| Your trade-in is a | | |
| Year __11__ Make ____ Model ____ Vehicle Identification No. ____ | | |
| Gross Trade-In Allowance | $ N/A | |
| Less Prior Credit or Lease Balance (e) | $ N/A | |
| Equals Net Trade In | $ 0.00 | |
| + Cash | $ 11,000.00 | |
| + Other | $ N/A | |
| (If total downpayment is negative, enter "0" and see 4I below) | $ 11,000.00 | (2) |
| 3 Unpaid Balance of Cash Price (1 minus 2) | | $ 22,180.00 (3) |
| 4 Other Charges Including Amounts Paid to Others on Your Behalf | | |
| (Seller may keep part of these amounts): | | |
| A Cost of Optional Credit Insurance | | |
| Paid to Insurance Company or Companies | | |
| Life | $ N/A | |
| Disability | $ N/A | $ N/A |
| B Vendor's Single Interest Insurance | | |
| Paid to Insurance Company | | $ 0.00 |
| C Other Optional Insurance Paid to Insurance | | |
| Company or Companies | | $ N/A |
| D Fees Paid to Government Agencies | | |
| to ____ for ____ | $ N/A | |
| to ____ for ____ | $ N/A | |
| to ____ for ____ | $ N/A | |
| E Government Taxes Not Included in Cash Price | | $ N/A |
| F Government License and/or Registration Fees | | |
| ____ | | $ 440.00 |
| G Government Certificate of Title Fees | | $ 0.00 |
| H Government Waste Tire Management Fee | | $ 0.00 |
| I Other Charges (Seller must identify who is paid and | | |
| describe purpose) | | |
| to ____ for Prior Credit or Lease Balance (e) | $ N/A | |
| to SHOWROOM AUTO, L for ____ | $ N/A | |
| to ____ for ____ | $ N/A | |
| to ____ for ____ | $ 0.00 | |
| to ____ for ____ | $ | |

**Insurance.** You may buy the physical damage insurance this contract requires from anyone you choose who is acceptable to us. You are not required to buy any other insurance to obtain credit unless the box indicating Vendor's Single Interest Insurance is required is checked below.

If any insurance is checked below, policies or certificates from the named insurance companies will describe the terms and conditions.

### Check the insurance you want and sign below:
**Optional Credit Insurance**

☐ Credit Life: ☐ Buyer ☐ Co-Buyer ☐ Both
☐ Credit Disability: ☐ Buyer ☐ Co-Buyer ☐ Both

Premium:
Credit Life $ N/A
Credit Disability $ N/A

Insurance Company Name _____

Home Office Address _____

Credit life insurance and credit disability insurance are not required to obtain credit. Your decision to buy or not buy credit life insurance and credit disability insurance will not be a factor in the credit approval process. They will not be provided unless you sign and agree to pay the extra cost. If you choose this insurance, the cost is shown in Item 4A of the Itemization of Amount Financed. Credit life insurance is based on your original payment schedule. This insurance may not pay all you owe on this contract if you make late payments. Credit disability insurance does not cover any increase in your payment or in the number of payments. Coverage for credit life insurance and credit disability insurance ends on the original due date for the last payment unless a different term for the insurance is shown below.

### Other Optional Insurance

☐ _____
Type of Insurance / Term
N/A
Premium $ _____
Insurance Company Name _____
Home Office Address _____

☐ _____
Type of Insurance / Term
N/A
Premium $ _____
Insurance Company Name _____
Home Office Address _____

Other optional insurance is not required to obtain credit. Your decision to buy or not buy other optional insurance will not be a factor in the credit approval process. It will not be provided unless you sign and agree to pay the extra cost. I want the insurance checked above.

X _____
Buyer Signature / Date

X _____
Co-Buyer Signature / Date

**THIS INSURANCE DOES NOT INCLUDE INSURANCE FOR YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE.**

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI

| | | | |
|---|---|---|---|
| G | Government Certificate of Title Fees | | 0.00 |
| H | Government Waste Tire Management Fee | | |
| I | Other Charges (Seller must identify who is paid and describe purpose) | | |

| | | | |
|---|---|---|---|
| to | | for Prior Credit or Lease Balance (e) | $ N/A |
| to SHOWROOM AUTO, I | | for | $ 0.00 |
| to | | for | $ N/A |
| to | | for | $ 0.00 |
| to | | for | $ N/A |
| to | | for | $ N/A |
| to | | for | $ N/A |
| to | | for | $ N/A |
| to | | for | $ N/A |

Total Other Charges and Amounts Paid to Others on Your Behalf   $   440.00 (4)

5   Amount Financed (3 + 4)   $   22,680.00 (5)

**GAP Waiver Notice**
☐ If this box is checked, and if the vehicle is a total loss because it is confiscated, damaged, or stolen, you will not be liable for the gap amount. The gap amount is the excess, if any, of (1) the amount you would owe under this contract as of the date of loss if the vehicle were not a total loss and you were to prepay the contract in full (less any refunds we get for cancelling optional insurance, maintenance, service or other contracts), over (2) the sum of (a) any past due payments and other amounts due because you broke promises in this contract and (b) the actual cash value of the vehicle immediately before the loss.

☐ If checked, your last installment payment under this contract is a balloon payment ("Balloon Payment"). You have the option to do one or more of the following, as checked, at the time the Balloon Payment is due:

a) ☑ You may pay your Balloon Payment when due.
b) ☑ You may refinance the Balloon Payment. See paragraph 1.e. on the reverse side of this contract for details.
c) ☐ You may sell the vehicle back to us. See paragraph 1.e. on the reverse side of this contract for details. If you exercise this option, $ _____ per mile for each mile in excess of _____ miles shown on the odometer will be deducted from the sale price. The sale price will also be adjusted for excess wear and use as provided in paragraph 1.e.

**Trade-In Payoff Agreement:** Seller relied on information from you and/or the lienholder or lessor of your trade-in vehicle to arrive at the payoff amount shown in item 2 of the Itemization of Amount Financed as the "Prior Credit or Lease Balance." You understand that the amount quoted is an estimate. If the actual payoff amount is more than the amount shown in 2 you must pay the Seller the excess on demand. If the actual payoff amount is less than the amount shown in 2 Seller will refund to you any overage Seller receives from your prior lienholder or lessor.

**Buyer Signature X** _____   **Co-Buyer Signature X** _____

**OPTION:** ☐ You pay no finance charge if the Amount Financed, item 5, is paid in full on or before _____, Year _____, SELLER'S INITIALS _____

**WARRANTIES**
The following paragraph does not affect any warranties covering the vehicle that the manufacturer may provide or limit any rights you may have under the Lemon Laws or, for used vehicles, under the certificate of serviceability that was included in your purchase contract. The following paragraph also does not apply if the vehicle is a used vehicle you bought in New York City.
**Unless the Seller makes a written warranty or enters into a service contract within 90 days of the date of this contract, the Seller makes no warranties on the vehicle. Making no warranties means that you get no express warranties, and no implied warranties of merchantability or fitness for a particular purpose.**
The following notice only applies to used vehicles bought in New York City:
**IMPORTANT NOTICE TO BUYER**
**(A) STATE LAW REQUIRES THAT SELLERS OF SECOND-HAND CARS CERTIFY IN WRITING TO THE BUYER THAT EACH CAR IS IN SAFE CONDITION AT THE TIME OF SALE.**
**(B) THIS CERTIFICATION IS A GUARANTEE THAT THE CAR IS IN SAFE CONDITION AT THE TIME OF SALE.**
**(C) YOU HAVE A RIGHT TO REQUEST THE DEALER TO REPAIR OR TO PAY IN FULL FOR REPAIRS OF ANY UNSAFE CONDITION IN THE CAR WHICH DOES NOT COMPLY WITH THIS CERTIFICATION.**
(D) THIS BUSINESS IS LICENSED BY THE DEPARTMENT OF CONSUMER AFFAIRS, 80 LAFAYETTE STREET, NEW YORK, NEW YORK 10013. COMPLAINT PHONE: (212) 964-7777.

**NO COOLING OFF PERIOD**
**State law does not provide for a "cooling off" or cancellation period for this sale. After you sign this contract, you may only cancel it if the seller agrees or for legal cause. You cannot cancel this contract simply because you change your mind. This notice does not apply to home solicitation sales.**

*The Annual Percentage Rate may be negotiable with the Seller. The Seller may assign this contract and retain its right to receive a part of the Finance Charge.*

**HOW THIS CONTRACT CAN BE CHANGED.** This contract contains the entire agreement between you and us relating to this contract. Any change to this contract must be in writing and we must sign it. No oral changes are binding.   Buyer Signs **X** _____   Co-Buyer Signs **X** _____
If any part of this contract is not valid, all other parts stay valid. We may delay or refrain from enforcing any of our rights under this contract without losing them. For example, we may extend the time for making some payments without extending the time for making others.
**See back for other important agreements.**
**NOTICE TO BUYER: 1. Do not sign this agreement before you read it or if it contains any blank space. 2. You are entitled to a completely filled in copy of the agreement. 3. Under the law, you have a right to pay off in advance the full amount due. If you do so, you may, depending on the nature of the credit service charge, either (a) prepay without penalty, or (b) under certain circumstances obtain a rebate of the credit service charge. 4. According to law, you have the privilege of purchasing the insurance on the motor vehicle provided for in this contract from an agent or broker of your own selection.**
**You agree to the terms of this contract. You confirm that before you signed this contract, we gave it to you, and you were free to take it and review it. You acknowledge that you have read both sides of this contract, including the arbitration provision on the reverse side, before signing below. You confirm that you received a completely filled-in copy when you signed it.**

**RETAIL INSTALMENT CONTRACT**
Buyer Signs **X** _____   Date 4-7-1_   Co-Buyer Signs **X** _____   Date _____
Co-Buyers and Other Owners — A co-buyer is a person who is responsible for paying the entire debt. An other owner is a person whose name is on the title to the vehicle but does not have to pay the debt. The other owner agrees to the security interest in the vehicle given to us in this contract.

Other owner signs here **X** _____   Address _____
Seller Signs _____   Date _____   By **X** _____   Title _____

Seller assigns its interest in this contract to _____   (Assignee) under the terms of Seller's agreement(s) with Assignee.
☐ Assigned with recourse   ☐ Assigned without recourse   ☐ Assigned with limited recourse

Seller _____   By _____   Title _____

**ILAW  FORM NO. 553-NY-B-A** (REV. 4/14)  U.S. PATENT NO. D460,782
©2014 The Reynolds and Reynolds Company   TO ORDER: www.reysource.com   1-800-344-0996; fax 1-800-531-9055
THE PRINTER MAKES NO WARRANTY, EXPRESS OR IMPLIED, AS TO CONTENT OR
FITNESS FOR PURPOSE OF THIS FORM. CONSULT YOUR OWN LEGAL COUNSEL.

**X** _____ Date _____

**THIS INSURANCE DOES NOT INCLUDE INSURANCE ON YOUR LIABILITY FOR BODILY INJURY OR PROPERTY DAMAGE.**

☐ VENDOR'S SINGLE INTEREST INSURANCE (VSI insurance): If the preceding box is checked, the Creditor requires VSI insurance for the initial term of the contract to protect the Creditor for loss or damage to the vehicle (collision, fire, theft). VSI insurance is for the Creditor's sole protection. This insurance does not protect your interest in the vehicle. **You may choose the insurance company through which the VSI insurance is obtained.** If you elect to purchase VSI insurance through the Creditor, **the cost of this insurance is $ _____** and is also shown in Item 4B of the Itemization of Amount Financed. The coverage is for the initial term of the contract.

**Returned Check Charge:** You agree to pay a charge of $ 20 if any check you give us is dishonored.

**Agreement to Arbitrate:** By signing below, you agree that, pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate.

Buyer Signs X _____
Co-Buyer Signs X _____

**CUSTOMER/TRUTH IN LENDING COPY**

**IMPORTANT AGREEMENTS**

**FINANCE CHARGE AND PAYMENTS**

a. **How we will figure Finance Charge.** We will figure the Finance Charge on a daily basis at the Annual Percentage Rate on the unpaid part of the Amount Financed.

b. **How we will apply payments.** We may apply each payment to the earned and unpaid part of the Finance Charge, to the unpaid part of the Amount Financed and to other amounts you owe under this contract in any order we choose.

c. **How late payments or early payments change what you must pay.** We based the Finance Charge, Total of Payments, and Total Sale Price shown on the front on the assumption that you will make every payment on the day it is due. Your Finance Charge, Total of Payments, and Total Sale Price will be more if you pay late and less if you pay early. Changes may take the form of a larger or smaller final payment or, at our option, more or fewer payments of the same amount as your scheduled payment with a smaller final payment. We will send you a notice telling you about these changes before the final scheduled payment is due.

d. **You may prepay.** You may prepay all or part of the unpaid part of the Amount Financed at any time. If you do so, you must pay the earned and unpaid part of the Finance Charge and all other amounts due up to the date of your payment.

e. **Balloon Payment Options.** Your Balloon Payment is due and payable as disclosed on the front of this contract. Because the contract is a simple finance charge contract, your Balloon Payment may differ from the amount shown depending on your payment habits. If checked on the front of the contract, you have the following options.

   *Pay In Full.* You may pay the Balloon Payment in full when due.

   *Refinance.* You may refinance the Balloon Payment unless you are in default under the contract. If we have advanced funds to cure any default, you must pay us back before the refinancing. You also must provide proof of insurance acceptable to us before the refinancing. The annual percentage rate for the refinancing will be the lower of the rate agreed to by you and us at the time of refinancing or the maximum rate permitted by law. The term of the refinancing will be based on the amount refinanced, the rate, and the amount of the monthly payment. The refinanced monthly payment will be the same as in this contract if the refinanced amount will be fully paid within 36 months of the due date of the Balloon Payment. Otherwise, the monthly payment amount will be the amount needed to fully pay the refinanced amount within 36 months of the due date of the Balloon Payment. If you wish to refinance, you must notify us in writing. The notice must be received no later than 30 days prior to the due date of the Balloon Payment. If you choose to refinance the Balloon Payment at the time the Balloon Payment is due, we will provide you with the disclosures required under the federal Truth in Lending Act in the agreement to refinance we make with you. Both you and we must sign the agreement to refinance.

   *Sell Back.* You may sell the vehicle to us for an amount equal to the Balloon Payment. You must pay us any other amount owed under the contract. The amount you owe will be based, in part, on the vehicle's mileage. You also must pay us the estimated costs of all repairs to the vehicle that are the result of excess mileage and excess wear and use, as described below and on the front of this contract. You must take the vehicle for inspection, to a place we select, no later than 15 days prior to the Balloon Payment due date. After the inspection, if you decide to sell the vehicle to us, you must deliver the vehicle to us no later than the Balloon Payment due date. At that time, you must also give us a title, which shows no liens other than our lien, transferring ownership to us or a person we select. After the inspection, if you decide not to sell the vehicle to us, you must immediately contact us and tell us whether you want to pay or refinance the last installment payment.

   You must pay us the excess mileage fee shown on the front of this contract. You are also responsible for repairs of all damage to the vehicle that is the result of excess wear and use. These repairs include, but are not limited to:

   • Replace any tire not part of a matching set of four or any tire which has less than 1/8 inch of remaining tread.
   • Repair all mechanical defects.
   • Repair or replace all dented, scratched, chipped, rusted or mismatched body panels, paint, or vehicle identification items; all dented, scratched, rusted, pitted, broken or missing trim and grill

• All proceeds from insurance, maintenance, service, or other contracts we finance for you. This includes any refunds of premiums or charges from the contracts.

This secures payment of all you owe on this contract. It also secures your other agreements in this contract. You will make sure the title shows our security interest (lien) in the vehicle. You will not allow any other security interest to be placed on the title without our written permission.

d. **Insurance you must have on the vehicle.**

You agree to have physical damage insurance covering loss of or damage to the vehicle for the term of this contract. The insurance must cover our interest in the vehicle. If you do not have this insurance, we may, if we choose, buy physical damage insurance. If we decide to buy physical damage insurance, we may either buy insurance that covers your interest and our interest in the vehicle, or buy insurance that covers only our interest. If we buy either type of insurance, we will tell you which type and the charge you must pay. The charge will be the cost of the insurance and a finance charge computed at the Annual Percentage Rate shown on the front of this contract.

If the vehicle is lost or damaged, you agree that we may use any insurance settlement to reduce what you owe or repair the vehicle.

e. **What happens to returned insurance, maintenance, service, or other contract charges.** If we get a refund of insurance, maintenance, service, or other contract charges, we may subtract the refund from what you owe.

3. **IF YOU PAY LATE OR BREAK YOUR OTHER PROMISES**

a. **You may owe late charges.** You will pay a late charge on each late payment as shown on the front. Acceptance of a late payment or late charge does not excuse your late payment or mean that you may keep making late payments.

   If you pay late, we may also take the steps described below.

b. **You may have to pay all you owe at once.** If you break your promises (default), we may demand that you pay all you owe on this contract at once subject to any right you have to reinstate the contract for less (see below). Default means:
   • You do not pay any payment on time;
   • You start a proceeding in bankruptcy or one is started against you or your property; or
   • You break any agreements in this contract.

   The amount you will owe will be the unpaid part of the Amount Financed plus the earned and unpaid part of the Prepaid Finance Charge and the Finance Charge, any late charges, and any amounts due because you defaulted.

c. **You may have to pay collection costs.** If we hire an attorney who is not our salaried employee to collect what you owe, you will pay the attorney's fee and court costs as permitted by law. The maximum attorney's fee you will pay will be 15% of the amount you owe.

d. **We may take the vehicle from you.** If you default, we may take (repossess) the vehicle from you if we do so peacefully and the law allows it. If your vehicle has an electronic tracking device, you agree that we may use the device to find the vehicle. If we take the vehicle, any accessories, equipment, and replacement parts will stay with the vehicle. If any personal items are in the vehicle, we may store them for you at your expense. If you do not ask for these items back, we may dispose of them as the law allows.

e. **How you can get the vehicle back if we take it.** If we repossess the vehicle, you may pay to get it back. If two things are true, you have the right to get the vehicle back by paying all past due payments, any late charges, and any expenses we incurred related to retaking the vehicle, holding it, and preparing it for sale (reinstate). First, you must have bought the vehicle primarily for personal, family, or household use. Second, your only default is a failure to pay an instalment payment on time. Otherwise, we will tell you how much to pay to get the vehicle back. Your right to get the vehicle back ends when we sell it.

f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a written notice of sale before selling the vehicle. We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us.

front of this contract. You are also responsible for repairs of any damage to the vehicle that is the result of excess wear and use. These repairs include, but are not limited to:

- Replace any tire not part of a matching set of four or any tire which has less than 1/8 inch of remaining tread.
- Repair all mechanical defects.
- Repair or replace all dented, scratched, chipped, rusted or mismatched body panels, paint or vehicle identification items; all dented, scratched, rusted, pitted, broken or missing trim and grill work; all scratched, cracked, pitted or broken glass; all faulty window mechanisms; all stains, burns or worn areas; and all damage which would be covered by collision or comprehensive insurance whether or not such insurance is actually in force.

If you have not made the repairs before inspection of the vehicle you will owe the estimated costs of such repairs, even if the repairs are not made prior to your sale of the vehicle to us. If you disagree with the estimated costs of repairs, you may have the repairs made at your expense prior to your sale of the vehicle to us.

2. **YOUR OTHER PROMISES TO US**
   a. **If the vehicle is damaged, destroyed, or missing.** The following paragraph does not apply if the box in the GAP Waiver Notice on the front of this contract is checked.
      You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed, or missing. The terms and conditions of your liability if the vehicle is damaged, destroyed, or missing are described in a separate document you sign. The document is a part of this contract.
   b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.
   c. **Security Interest.**
      You give us a security interest in:
      - The vehicle and all parts or goods installed in it;
      - All money or goods received (proceeds) for the vehicle;
      - All insurance, maintenance, service, or other contracts we finance for you; and

f. **We will sell the vehicle if you do not get it back.** If you do not redeem, we will sell the vehicle. We will send you a notice before selling the vehicle. We will apply the money from the sale, less allowed expenses, to the amount you owe. Allowed expenses are expenses we pay as a direct result of taking the vehicle, holding it, preparing it for sale, and selling it. Attorney fees and court costs the law permits are also allowed expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay this amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
   **Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.**

5. **Servicing and Collection Contacts.**
   You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

6. **Applicable Law**
   Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

**ARBITRATION PROVISION**
**PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS**
1. **EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.**
2. **IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.**
3. **DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT, AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.**

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association, 1633 Broadway, 10th Floor, New York, New York 10019 (www.adr.org), or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website.

- Repair all mechanical defects.

rusted or mismatched body panels, paint or vehicle identification items; all dented, scratched, rusted, pitted, broken or missing trim and grill work; all scratched, cracked, pitted or broken glass; all faulty window mechanisms; all stains, burns or worn areas; and all damage which would be covered by collision or comprehensive insurance whether or not such insurance is actually in force.

If you have not made the repairs before inspection of the vehicle you will owe the estimated costs of such repairs, even if the repairs are not made prior to your sale of the vehicle to us. If you disagree with the estimated costs of repairs, you may have the repairs made at your expense prior to your sale of the vehicle to us.

## 2. YOUR OTHER PROMISES TO US

a. **If the vehicle is damaged, destroyed, or missing.** The following paragraph does not apply if the box in the GAP Waiver Notice on the front of this contract is checked.
You agree to pay us all you owe under this contract even if the vehicle is damaged, destroyed or missing. The terms and conditions of your liability if the vehicle is damaged, destroyed, or missing are described in a separate document you sign. The document is a part of this contract.

b. **Using the vehicle.** You agree not to remove the vehicle from the U.S. or Canada, or to sell, rent, lease, or transfer any interest in the vehicle or this contract without our written permission. You agree not to expose the vehicle to misuse, seizure, confiscation, or involuntary transfer. If we pay any repair bills, storage bills, taxes, fines, or charges on the vehicle, you agree to repay the amount when we ask for it.

c. **Security interest.**
You give us a security interest in:
- The vehicle and all parts or goods installed in it;
- All money or goods received (proceeds) for the vehicle;
- All insurance, maintenance, service, or other contracts we finance for you; and

vehicle, holding it, preparing it for sale and selling it. Attorney fees the law allows, and court costs. We will also deduct expenses. If any money is left (surplus), we will pay it to you unless the law requires us to pay it to someone else. If money from the sale is not enough to pay the amount you owe, you must pay the rest to us. If you do not pay the amount when we ask, we may charge you interest at a rate not exceeding the highest lawful rate until you pay.

g. **What we may do about optional insurance, maintenance, service, or other contracts.** This contract may contain charges for optional insurance, maintenance, service, or other contracts. If we repossess the vehicle, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe or repair the vehicle. If the vehicle is a total loss because it is confiscated, damaged, or stolen, we may claim benefits under these contracts and cancel them to obtain refunds of unearned charges to reduce what you owe.

4. **Used Car Buyers Guide.** The information you see on the window form for this vehicle is part of this contract. Information on the window form overrides any contrary provisions in the contract of sale.
Spanish Translation: Guía para compradores de vehículos usados. La información que ve en el formulario de la ventanilla para este vehículo forma parte del presente contrato. La información del formulario de la ventanilla deja sin efecto toda disposición en contrario contenida en el contrato de venta.

5. **Servicing and Collection Contacts.**
You agree that we may try to contact you in writing, by e-mail, or using prerecorded/artificial voice messages, text messages, and automatic telephone dialing systems, as the law allows. You also agree that we may try to contact you in these and other ways at any address or telephone number you provide us, even if the telephone number is a cell phone number or the contact results in a charge to you.

6. **Applicable Law**
Federal law and the law of the state of our address shown on the front of this contract apply to this contract.

**NOTICE: ANY HOLDER OF THIS CONSUMER CREDIT CONTRACT IS SUBJECT TO ALL CLAIMS AND DEFENSES WHICH THE DEBTOR COULD ASSERT AGAINST THE SELLER OF GOODS OR SERVICES OBTAINED PURSUANT HERETO OR WITH THE PROCEEDS HEREOF. RECOVERY HEREUNDER BY THE DEBTOR SHALL NOT EXCEED AMOUNTS PAID BY THE DEBTOR HEREUNDER.**

The preceding NOTICE applies only to goods or services obtained primarily for personal, family, or household use. In all other cases, Buyer will not assert against any subsequent holder or assignee of this contract any claims or defenses the Buyer (debtor) may have against the Seller, or against the manufacturer of the vehicle or equipment obtained under this contract.

---

## ARBITRATION PROVISION
### PLEASE REVIEW - IMPORTANT - AFFECTS YOUR LEGAL RIGHTS

1. EITHER YOU OR WE MAY CHOOSE TO HAVE ANY DISPUTE BETWEEN US DECIDED BY ARBITRATION AND NOT IN COURT OR BY JURY TRIAL.
2. IF A DISPUTE IS ARBITRATED, YOU WILL GIVE UP YOUR RIGHT TO PARTICIPATE AS A CLASS REPRESENTATIVE OR CLASS MEMBER ON ANY CLASS CLAIM YOU MAY HAVE AGAINST US INCLUDING ANY RIGHT TO CLASS ARBITRATION OR ANY CONSOLIDATION OF INDIVIDUAL ARBITRATIONS.
3. DISCOVERY AND RIGHTS TO APPEAL IN ARBITRATION ARE GENERALLY MORE LIMITED THAN IN A LAWSUIT. AND OTHER RIGHTS THAT YOU AND WE WOULD HAVE IN COURT MAY NOT BE AVAILABLE IN ARBITRATION.

Any claim or dispute, whether in contract, tort, statute or otherwise (including the interpretation and scope of this Arbitration Provision, and the arbitrability of the claim or dispute), between you and us or our employees, agents, successors or assigns, which arises out of or relates to your credit application, purchase or condition of this vehicle, this contract or any resulting transaction or relationship (including any such relationship with third parties who do not sign this contract) shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action. If federal law provides that a claim or dispute is not subject to binding arbitration, this Arbitration Provision shall not apply to such claim or dispute. Any claim or dispute is to be arbitrated by a single arbitrator on an individual basis and not as a class action. You expressly waive any right you may have to arbitrate a class action. You may choose the American Arbitration Association, 1633 Broadway, 10th Floor, New York, New York 10019 (www.adr.org), or any other organization to conduct the arbitration subject to our approval. You may get a copy of the rules of an arbitration organization by contacting the organization or visiting its website. Arbitrators shall be attorneys or retired judges and shall be selected pursuant to the applicable rules. The arbitrator shall apply governing substantive law and the applicable statute of limitations. The arbitration hearing shall be conducted in the federal district in which you reside unless the Seller-Creditor is a party to the claim or dispute, in which case the hearing will be held in the federal district where this contract was executed. We will pay your filing, administration, service or case management fee and our arbitrator or arbitration fee up to $5000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount we pay may be reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible for its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law. If the chosen arbitration organization's rules conflict with this Arbitration Provision, then the provisions of this Arbitration Provision shall control. Any arbitration under this Arbitration Provision shall be governed by the Federal Arbitration Act (9 U.S.C. § 1 et. seq.) and not by any state law concerning arbitration. Any award by the arbitrator shall be in writing and will be final and binding on all parties, subject to any limited right to appeal under the Federal Arbitration Act.

You and we retain the right to seek remedies in small claims court for disputes or claims within that court's jurisdiction, unless such Action is transferred, removed or appealed to a different court. Neither you nor we waive the right to arbitrate by using self-help remedies, such as repossession, or by filing an action to recover the vehicle, to recover a deficiency balance, or for individual injunctive relief. Any court having jurisdiction may enter judgment on the arbitrator's award. This Arbitration Provision shall survive any termination, payoff or transfer of this contract. If any part of this Arbitration Provision, other than waivers of class action rights, is deemed or found to be unenforceable for any reason, the remainder shall remain enforceable. If a waiver of class action rights is deemed or found to be unenforceable for any reason in a case in which class action allegations have been made, the remainder of this Arbitration Provision shall be unenforceable.

# Exhibit C

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
WILLIAM J. LOVELACE and OCTAVIA
LOVELACE,

                         Plaintiffs,

             -against-

SHOWROOM AUTO, LLC,

                        Defendant.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**
16 CV 4978 (ERK) (CLP)

**POLLAK**, United States Magistrate Judge:

On September 7, 2016, plaintiffs William J. Lovelace and Octavia Lovelace ("plaintiffs")

commenced this action against Showroom Auto, LLC ("defendant" or "Showroom"), an automobile

dealer located on Long Island, New York, for alleged violations of the Truth in Lending Act ("TILA"),

15 U.S.C. §§ 1601, et seq., and New York's Deceptive Acts and Practices and False Advertising

statutes, General Business Law ("GBL") §§ 349 and 350. (Compl.[1] ¶¶ 2–4).

On November 3, 2016, plaintiffs moved, pursuant to Rule 55 of the Federal Rules of Civil

Procedure, for entry of default. The Clerk of Court entered default on November 4, 2016. On January

20, 2017, plaintiffs moved for default judgment.

While that motion was pending, defendant filed a cross motion on January 27, 2017, seeking to

vacate and set aside the default, pursuant to Rule 55 of the Federal Rules of Civil Procedure, on the

grounds that counsel for defendant could demonstrate excusable neglect in failing to respond to the

Complaint. Defendant also cross moved, pursuant to Rule 12(b)(6) of the Federal Rules of Civil

Procedure, to dismiss plaintiffs' Complaint because plaintiffs had entered into an agreement with

defendant which obligated the parties to arbitrate any disputes. The Honorable Edward R. Korman

---

[1] Citations to "Compl." refer to the initial Complaint filed by the Lovelaces on September 7, 2016.

granted defendant's motion to vacate the default on February 6, 2017, and on April 12, 2017, referred the Cross Motion to Dismiss and/or Compel Arbitration to the undersigned to prepare a Report and Recommendation.

For the reasons set forth below, it is respectfully recommended that defendant's Cross Motion to Compel Arbitration and Motion to Dismiss be granted in part and denied in part.

## FACTUAL BACKGROUND

A.  Plaintiffs' Allegations as to the Hidden Car Fees

On April 7, 2017, Octavia Lovelace and her father, William Lovelace, went to defendant Showroom Auto to inquire about a 2014 Mercedes-Benz C Class they had seen listed online for $23,981.00. (Compl. ¶ 9).  Although Octavia Lovelace planned to be the primary driver of the vehicle, she did not qualify for financing.  (Id. ¶ 14).  Therefore, the buyer on the Retail Instalment Contract ("Contract") is listed solely as William Lovelace, not Octavia.  (Id. ¶ 16; Def.'s Mem.,[2] Ex. F). However, plaintiffs allege that defendant knew that Octavia would be making the car payments and would be the driver of the car.  (Compl. ¶ 13).

The Contract lists $33,180.00 as the total purchase price for the car.  (Compl. ¶ 17; Def.'s Mem., Ex. F).  On April 7, 2017, Octavia put down $10,000 toward the purchase price of the vehicle. (Compl. ¶ 12).  The parties also made arrangements to pay an additional $1,000 from Octavia's bank account toward the down-payment within two weeks of that date.  (Id. ¶ 15).  Plaintiffs allege that they did not receive a Buyer's Order for the vehicle and that William Lovelace was rushed through the signing of the Contract.  (Id. ¶¶ 21-22).

---

[2] Citations to "Def.'s Mem." refer to the Memorandum of Law in Support of Defendant's Cross Motion to Vacate Default and to Dismiss Plaintiffs' Claim, filed by Showroom on January 30, 2017.

At the time of the sale, the Contract was assigned to Exeter Finance Corp., which has not been sued as a defendant in this action. (Def.'s Mem., Ex. F). Although the Contract listed a cash price of $33,180.00, and Octavia had already paid a total of $11,000 in a down-payment, immediately upon receiving the first invoice from Exeter, plaintiffs learned that the balance owed was $22,620.00 instead of the $22,180.00 that they had expected. (Compl. ¶ 23). This amount included an extended warranty and a fee for reconditioning the vehicle. (Id.) Plaintiffs allege that defendant had not disclosed the reconditioning fee and had not itemized the warranty agreement or service contract. (Id. ¶¶ 23–24).

Plaintiffs argue that Showroom Auto violated TILA by increasing the vehicle's purchase price based on William's credit. (Id. ¶ 26). They argue that by not itemizing certain costs, such as a service contract, within the itemization of the amount financed, defendant has also violated Section 359 of the GBL which prohibits deceptive acts in business, and Section 310 of the GBL which prohibits false advertising. (Id. ¶¶ 27, 29–32).

## B. Defendant's Response to the Claims

Defendant contends that this was an "ordinary used car transaction" which plaintiffs voluntarily executed. (Def.'s Mem. at 4). Defendant maintains that its online advertisement stated explicitly that "sales prices do not include Used Vehicle Recon. Fee, Prep, Tax & DMV Fees. See Dealer for details." (Merceus Decl.[3] ¶ 15, Ex. A). It also contends that its salesman advised plaintiffs that in addition to the basic sales price listed on the advertisement, the car was subject to this reconditioning fee, and indeed, Octavia Lovelace signed an acknowledgment that this fee was explained to her. (Id. ¶ 16, Ex. B). Defendant alleges that the remainder of the sum charged to plaintiff was for a theft deterrent

---

[3] Citations to "Merceus Decl." refer to the Declaration of Bernard Merceus, dated January 27, 2017.

protection plan, a New York State Department of Motor Vehicles Registration Fee, and state sales tax. (Id. ¶ 19).

Defendant asserts that Octavia Lovelace's credit was "not sufficient to support a loan large enough to purchase the car so William Lovelace agreed to make the purchase in her place. The dealer's fee to arrange the financing was $1,340.00." (Pollack Decl.[4] ¶ 20). On the whole, defendant maintains that the transaction was "open and above board in all respects." (Id.)

C.  The Arbitration Clause

According to defendant, the Retail Instalment Contract entered into by plaintiffs sets forth the method by which the buyer and seller would litigate disputes. (Id. ¶ 13; Def.'s Mem., Ex. F). The Arbitration Provision is included on the last page of the six-page Contract, and is in its own box separated from the rest of the document language. (Id.) At the top of the box, the lettering is in bold, capital letters. (Merceus Decl. ¶¶ 25-26; Def.'s Mem., Ex. F). It states:

**ARBITRATION PROVISION**
**PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS.**

The subsequent provision notes that "either you or we may choose to have any dispute between us decided by arbitration and not in court or by jury trial." (Id.) It also provides that "discovery and rights to appeal in arbitration are generally more limited than in a lawsuit, and other rights that you and we would have in court may not be available in arbitration." (Id.; Pls.' Mem. at 7). The Provision continues:

> Any claim or dispute, whether in contract, tort, statute or otherwise
> (including the interpretation and scope of this Arbitration Agreement, and
> the arbitrability of the claim or dispute), between you and us or our
> employees, agents, successors or assigns, which arises out of or relates to
> your credit application, purchase, or condition of this vehicle, your
> purchase or financing contract or any resulting transaction or relationship

---

[4] Citations to "Pollack Decl." refer to the Declaration of Ira Pollack, dated January 27, 2017.

> (including any such relationship with third parties who do not sign your
> purchase or financing contract) shall, at your or our election, be resolved
> by neutral, binding arbitration and not by a court action. . . .

(Id.)

On the third page of the Contract, directly above the signature lines for the buyer and seller, the

bolded text reads as follows:

> **You agree to the terms of this contract. You confirm that before you
> signed this contract, we gave it to you, and you were free to take it and
> review it. You acknowledge that you have read both sides of this
> contract, including the arbitration provision on the reverse side,
> before signing below.**

(Def.'s Mem., Ex. F). Both William Lovelace and a representative for Showroom signed the

Instalment Contract. Octavia Lovelace did not sign the document. (Id.).

Defendant seeks to enforce this arbitration provision of the Contract, arguing that the language

requires arbitration as the parties' chosen dispute resolution method. (Def.'s Mem. at 8). Defendant

also notes that federal policy strongly favors the enforcement of arbitration clauses in contracts. (Id. at

11).

Plaintiffs raise a number of issues in response. First, they contend that because Octavia did not

sign any pages of the Contract, she cannot be compelled to arbitrate. (Pls.' Mem. at 2-3). Plaintiffs

cite to a string of cases to argue that "the claims of Octavia Lovelace, who was not a signatory to the

arbitration clause . . . should not be dismissed on account of those provisions." (Id. at n.5).

Second, plaintiffs argue that the arbitration clause is unenforceable because two of the other

sales documents mention "court" as a dispute resolution forum. (Id. at 10). The purchase order

provides that "in the event of litigation same shall be instituted only **in a court** of competent

jurisdiction." (Id.; Merceus Decl. ¶ 10, Ex. E). Additionally, the Customer Acknowledgment form

similarly provides that "in the event of litigation same shall be instituted only **in the court** . . . ."

(Def.'s Mem., Ex. M). Plaintiffs argue that because the parties have entered into inconsistent dispute resolution provisions, there has been no mutual assent to arbitrate. (Pls.' Mem. at 9).

Finally, plaintiffs assert that even if the arbitration clause is enforceable in certain cases, defendants did not properly elect arbitration in this case. (Id. at 8). Plaintiffs argue that "defendant could have elected arbitration by either initiating an arbitration proceeding or by filing a motion under § 3 of the FAA to have this action stayed pending arbitration," but that, in this case, "it has done neither." (Id.) Plaintiffs therefore argue that the Court should decline to compel arbitration.

DISCUSSION

I.    Enforceability of Arbitration Agreement

    A.    Legal Standard

In order to determine whether a claim should be submitted to arbitration, courts generally assess 1) whether the parties had an agreement to arbitrate; 2) the scope of that agreement; 3) whether Congress intended the asserted claims to be nonarbitrable; and 4) whether to stay the balance of the proceedings pending arbitration if some, but not all, of the claims are subject to arbitration. Guyden v. Aetna, 544 F.3d 376, 382 (2d Cir. 2008).

The Supreme Court and the Second Circuit have generally enforced agreements to arbitrate, noting that there is a strong federal policy in favor of promoting arbitration consistent with legislative intent. The Federal Arbitration Act, 9 U.S.C. § 1 et seq. ("FAA"), provides that "[a] written provision . . . to settle by arbitration . . . shall be valid, irrevocable, enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. See AT&T Mobility v. Concepcion, 563 U.S. 33, 344-45 (2011); Arciniaga v. General Motors Corp., 460 F.3d 231, 234 (2d Cir. 2006). The FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts shall direct the parties to proceed to arbitration on issues as to which an arbitration

6

agreement has been signed." Genesco v. T. Kakiuchi, 815 F.2d 840 (2d Cir. 1987) (citations and quotations omitted). Based on this strong federal policy, a broad agreement to arbitrate creates a presumption of arbitrability which may only be overcome by "positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." Holick v. Cellular Sales of New York, LLC, 802 F.3d 391, 395 (2d Cir. 2015) (quoting Smith/Enron Cogeneration Ltd. P'ship v. Smith Cogeneration Int'l, 198 F.3d 88, 99 (2d Cir. 1999).

### B.  Arbitrability of TILA and GBL Claims

As an initial matter, neither party appears to dispute that TILA claims or claims under the GBL are arbitrable.

#### 1)  TILA Claims

The purpose of the Truth in Lending Act ("TILA") is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available . . . and to protect the consumer against inaccurate and unfair credit billing and credit card practices." 15 U.S.C. § 1601. To accomplish this goal, TILA requires creditors to disclose certain information and in a particular manner. TILA requires a "lender or creditor to provide 'a written itemization of the amount financed,' including 'each amount that is or will be paid to third persons by the creditor on the consumer's behalf, together with an identification of or reference to the third person.'" Pierre v. Planet Automotive, 193 F. Supp. 3d 157, 164 (E.D.N.Y. 2016) (internal citations omitted).

According to the regulations implementing the TILA, a finance charge is "imposed directly or indirectly by the financial institution either as an incident to or as a condition of an extension of consumer credit," not including any charge of a type payable in a comparable cash transaction (such as

7

taxes, title, licenses or registration fees).  12 C.F.R. § 226.4(a).  (See also Pls.' Mot. Def. J. at 8).[5] Since this finance charge could be hidden in the total cost charged to a consumer, TILA "requires clear and accurate disclosures by creditors to consumers of any finance charge that the consumer will bear under the credit transaction." Diaz v. Paragon Motors, 424 F. Supp. 2d 519, 529 (E.D.N.Y. 2006); see also 15 U.S.C. § 1638(a)(4).

As "numerous courts have found TILA claims to be arbitrable," plaintiffs do not dispute that the underlying TILA claims are arbitrable.  See In re Currency Conversion Fee Antitrust Litig., 265 F. Supp. 2d 385, 408 (S.D.N.Y. 2003) (citing cases).

### 2) GBL Sections 349 and 350

Similarly, claims under Sections 349 and 350 of the New York GBL may be resolved through arbitration. See Kuehn v. Citibank, No. 12 CV 3287, 2012 WL 6057941, at *5 (S.D.N.Y. Dec. 6, 2012).

New York GBL §§ 349 and 350 broadly prohibit "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state . . ." N.Y. Gen. Bus. Law § 349 (a).  Deceptive acts are defined as those that are "likely to mislead a reasonable consumer acting reasonably under the circumstances." Horowitz v. Stryker Corp., 613 F. Supp. 2d 271, 286 (E.D.N.Y. 2009) (quoting Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank, N.A., 85 N.Y.2d 20, 26, 647 N.E.2d 741, 745, 623 N.Y.S.2d 529, 533) (1995).

Similar to the TILA claim described above, plaintiffs do not argue that GBL claims are not arbitrable.  Instead, they oppose arbitration on the grounds that they did not agree to arbitrate, and contend that, therefore, defendant's motion to compel arbitration should be denied.

---

[5] Citations to "Pls.' Mot. Def. J." refer to Plaintiffs' Memorandum of Law in Support of Motion for Judgment on Default, filed January 20, 2017.

### C. Whether the Parties Agreed to Arbitrate

In determining whether the parties agreed to arbitrate this dispute, the Court looks to the language of the Contract at issue and applies ordinary state contract law. <u>See</u> <u>First Options of Chicago v. Kaplan</u>, 514 U.S. 938, 939 (1995). This is because arbitration itself is "a matter of contract." <u>Rent-A-Center, West v. Jackson</u>, 561 U.S. 63, 65 (2010). Thus, general contract provisions govern the enforceability of the arbitration agreement, and, similarly, contract defenses such as fraud can serve as a defense. <u>Id.</u> (citing <u>Doctor's Assocs., Inc. v. Casarotto</u>, 517 U.S. 681, 687 (1996)).

### 1) <u>William Lovelace</u>

#### a) <u>Agreement to Arbitrate</u>

Looking to the language of the Instalment Contract, on the top of the first page of the Contract, directly underneath the title "Retail Instalment Contract," there appears the language "Simple Finance Charge **(With Arbitration Provision)."** (Def.'s Mem., Ex. F) (emphasis added).

The actual Arbitration Provision is set forth on page 6 of the Contract. It unequivocally provides that either party "may choose to have any dispute between us decided by arbitration and not in court or by jury trial." (Def.'s Mem., Ex. F). Not only does this language appear delineated in its own separate box and highlighted by a bolded capitalized title — **"ARBITRATION PROVISION – PLEASE REVIEW – IMPORTANT – AFFECTS YOUR LEGAL RIGHTS"** — but it is followed by a second reference on the third page of the agreement reminding buyers that they agree to the terms of the Contract, and that they have read both sides of the Contract, including the arbitration provision on the reverse side. This language: "you acknowledge that you have read both sides of this contract, including the arbitration provision on the reverse side, before signing below," appears directly above the signature lines of the Contract. In this case, William Lovelace signed the Contract. (<u>Id.</u>)

9

Thus, the language of the Contract clearly sets forth the Arbitration clause; it is not hidden or concealed in tiny typeface that a buyer might not see.

### b) Scope of Arbitration Agreement

Moreover, the scope of the arbitration language is extremely broad, encompassing "any claim or dispute, whether in contract, tort, statute or otherwise," arising out of or relating to the "credit application, purchase, or condition of" the vehicle. (Id.) It also includes the interpretation of the arbitration clause itself and "the arbitrability of the claim or dispute." (Id.)

In reviewing the same boilerplate arbitration language that it is in this Contract, this Court, in a prior case, noted the breadth of the agreement and concluded that TILA claims are covered by it. See Cho v. JS Autoworld, 97 F. Supp. 3d 351 (E.D.N.Y. 2015). The Court in Cho highlighted the language that "**any claim or dispute**. . . (including the interpretation and scope of this Arbitration Agreement, and the arbitrability of the claim or dispute) . . . shall, at your or our election, be resolved by neutral, binding arbitration and not by a court action" (emphasis added). Id. at 357. In the Cho court's view, this "broad scope" "clearly encompasse[d]" the plaintiff's underlying TILA claims. Id.

In light of the broad language of the Contract, the Court finds that the agreement to select arbitration "clearly encompassed" the claims raised by plaintiffs' Complaint, including the TILA and GBL claims.

### c) Lack of Signature

Neither party has raised a concern that the parties did not sign the separate "agreement to arbitrate." The agreement to arbitrate that appears in a box in the upper right hand corner of the Contract on page 3 contains its own signature lines, in addition to the signature lines that appear on page 6 at the end of the Contract. (See Def.'s Mem., Ex. F). This agreement to arbitrate reads: "By

10

signing below, you agree that, pursuant to the Arbitration Provision on the reverse side of this contract, you or we may elect to resolve any dispute by neutral, binding arbitration and not by a court action. See the Arbitration Provision for additional information concerning the agreement to arbitrate." (Id., Ex. F). While William Lovelace signed the Contract on page 6, the signature lines in this box have been left blank. (Id.)

Nonetheless, even if the parties (presumably plaintiffs) had raised the argument that the agreement to arbitrate was invalid because they did not sign this provision, courts have held that, in order for an arbitration provision to be valid, there need only be proof that the parties intended to be bound by such an agreement; a signature is not required. See Cho v. JS Autoworld, 97 F. Supp. 3d at 356 (holding that "indeed, even if the Agreement had not been signed by either party, the Court could still find that a valid arbitration agreement existed") (quoting BeautyKo v. Fedex, No. 14 CV 0037, 2015 WL 224361, at *3 (S.D.N.Y. Jan. 16, 2015)). Furthermore, the court in Cho recently held that "[w]hile the FAA mandates that arbitration agreements be in writing, it does not require that they be signed." Cho v. JS Autoworld, 97 F. Supp. 3d at 356. This principle is reflected in New York's arbitration statute, which simply requires a "written agreement" to submit a controversy to arbitration; it does not require that this agreement be signed. See N.Y. C.P.L.R. § 7501.

### d) Inconsistent Dispute Resolution Provisions

#### i. The Parties' Arguments

Plaintiffs contend that because there are "inconsistent dispute-resolution provisions, there has been no mutual assent to arbitrate." (Pls.' Mem. at 9) (citing NAACP of Camden County East v. Foulke Management Corp. ("Foulke"), 421 N.J. Super 404, 24 A.3d 777 (N.J. Super. Ct. App. Div. 2011)). Plaintiffs rely on the court's decision in Foulke, where the contract documents at issue contained different arbitration clauses, each having various rules about the nature and location of the

11

arbitration forum, inconsistent provisions about the time limit in which arbitration must be initiated, and assorted descriptions of the costs of arbitration. 421 N.J. Super at 431, 24 A.3d at 794. The court found that "viewed in their totality, the arbitration provisions scattered among the [different contract documents] are too plagued with confusing terms and inconsistencies to put a reasonable consumer on fair notice of their intended meaning." Id.

Plaintiffs argue that the documents in this matter contain similar inconsistencies, with the Retail Instalment Contract requiring arbitration but the other documents referring to resolution of disputes in "court." Specifically, plaintiffs point to the mention of "a court" in the third paragraph of the Customer Acknowledgment, which reads: ". . . in the event of litigation same shall be instituted only **in the court** at 89-17 Sutphin Blv, Jamaica, New York . . . ." (Def.'s Mem., Ex. M) (emphasis added). Plaintiffs also note that the Vehicle Purchase Agreement refers to litigation in a "**court** of competent jurisdiction." (Def.'s Mem., Ex. F) (emphasis added). They contend that these two provisions in the Acknowledgment and in the Vehicle Purchase Agreement render the arbitration clause in the Retail Instalment Contract too confusing and therefore unenforceable.

ii. <u>Analysis</u>

In considering the plaintiffs' arguments, the Court notes first that <u>Foulke</u> is an out-of-state decision interpreting New Jersey law and is not binding on this case for a variety of reasons. First, the facts of the case are distinguishable from the ones at hand. In this case, unlike in <u>Foulke</u>, there is only one arbitration provision appearing in the Retail Instalment Contract, and its terms are clear. While the Customer Acknowledgment form summarizes provisions from the other documents, including a provision about the conditions for recovering possession of the car, the customer's responsibility to insure the vehicle, and the responsibility of the customer if the check bounces, it contains no mention of arbitration. Moreover, while the Acknowledgment form contains a choice of law provision and

provides that "litigation as per the terms of this agreement" shall be instituted in a specific state court, the reference to "this agreement" indicates an intention to have disagreements related to the Customer Acknowledgment form litigated in state court.[6] In this case, the claims at issue arise under the Retail Installment Contract, not the Customer Acknowledgment agreement.[7]

### e) Effect of Assignment

Plaintiffs note that the Instalment Contract was assigned by defendant to a third party, Exeter Finance Corp. They argue that because the Instalment Contract is the only document that refers to the arbitration clause, and Showroom Auto is no longer a party to the Contract, having assigned it to Exeter, the forum selection clauses in the other documents should govern this dispute. (Pls.' Mem. at 13).

However, the arbitration clause in the Contract specifies that it covers any dispute "between you and us or our employees, agents, successors or **assigns**, which arises out of or relates to your credit application, purchase, or condition of this vehicle, this contract or any resulting transaction or relationship (**including any such relationship with third parties who do not sign this contract**) . . . " (Def.'s Mem., Ex. F.) (emphasis added). The clause continues: "This Arbitration Provision shall survive any termination, payoff or **transfer** of this contract." (emphasis added).

---

[6] This Court need not assess the validity of the Customer Acknowledgment agreement here, since the disagreement at issue does not arise under it. However, the Court notes that the last paragraph of the Customer Acknowledgment contains a sentence that the "parties [to] this agreement . . . waive all right to a trial by jury in any proceeding, action or counterclaim." (Def.'s Mem., Ex. M).

[7] As discussed supra, this Court notes that TILA is a disclosure rule requiring clear and conspicuous disclosures, in meaningful sequence, in writing, and in a form the consumer may keep. See 15 U.S.C. § 1637. While a plaintiff need not have been provided a form to bring a TILA violation suit, in this case, it seems clear that plaintiffs' TILA claims arise out of the form they were given; they do not argue that they were not given the disclosures at all.

Even though the Contract was assigned to Exeter the same date it was signed, the Court finds that the arbitration provision survived such assignment. The Arbitration Agreement, therefore, is valid as between the Lovelaces and Showroom, as well as the Lovelaces and Exeter; any of the parties could seek to enforce it, as Showroom has in this case.

### f) Fraud

Although plaintiffs do not expressly allege fraud and misrepresentation, they claim that William was "rushed" to sign the Contract, implying that he was somehow misled or did not become aware of the Contract's terms. (Compl. ¶¶ 21–22). Under New York law, a plaintiff claiming fraud in the course of a contract must prove, by clear and convincing evidence, a material misrepresentation or omission of fact made knowingly by the defendant with the intent to defraud, the plaintiff's reasonable reliance, and the resulting damage. See, e.g., Bank of America v. Bear Stearns, 969 F. Supp. 2d 339 (S.D.N.Y. 2013); see also Ramirez v. Nat'l Coop Bank, 91 A.D.3d 204, 989 N.Y.S.2d 280 (2011) (finding that plaintiff stated a cause of action for fraud when plaintiff, an "uneducated Spanish-speaking Honduran immigrant on disability and food stamps," was led to a dealership through "false promises of a cash prize or a free cruise," and proceeded to sign paperwork, written only in English, to buy three cars). In the Lovelace's case, there are no facts alleged suggesting that defendant made a misrepresentation or omitted any information relevant to the arbitration agreement that would induce them sign the agreement in reliance thereof. There are also no facts indicating that William has a low level of education or speaks a language other than English that might make him more potentially vulnerable for exploitation in reviewing a contract. The record is devoid of any facts that would suggest fraud or misrepresentation in the signing of the Contract or in the arbitration provisions generally.

14

Thus, while the record mentions that William was "rushed," without any other indicators of fraud, there is no basis on which to conclude that there was bad faith or fraud involved here.

### g) Defendant Failed to Commence Arbitration

Plaintiffs argue that there is a procedure that defendant failed to follow in order to elect arbitration. (Pls.' Mem. at 7). They maintain that defendant has not followed the proper procedure to elect arbitration, relying on the language within the arbitration clause providing that "either you or we may **choose** to have any legal dispute decided by arbitration . . ." as well as the subsequent sentence, "any claim or dispute . . . shall, at your or our **election** . . ." (Def.'s Mem., Ex. F). As discussed <u>supra</u>, plaintiffs argue that "defendant could have elected arbitration by either initiating an arbitration proceeding or by filing a motion under § 3 of the FAA to have this action stayed pending arbitration," but that, in this case, "it has done neither."

In citing § 3 of the FAA, however, plaintiffs fail to cite the very next section, 9 U.S.C. § 4, which specifically provides: "a party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. The statutory language itself thus specifically provides that a party may request arbitration of its claims when parties have agreed in writing to arbitrate and one party has instead filed its claims in a court.

In light of the above, this Court respectfully recommends a finding that defendant's procedure to compel arbitration as to William Lovelace is appropriate.

2) Octavia Lovelace

The same principles apply to Octavia Lovelace, even though she did not sign the arbitration

provision. The Second Circuit has "made clear that a nonsignatory party may be bound to an

arbitration agreement if so dictated by the 'ordinary principles of contract and agency.'" Thomson-

CSF, S.A. v. American Arbitration Ass'n, 64 F.3d 773 (2d Cir. 1995) (quoting McAllister Bros., Inc.

v. A&S Transp. Co., 621 F.2d 519, 524 (2d Cir. 1980)). This Circuit has recognized five theories for

binding nonsignatories to arbitration agreements: 1) incorporation by reference; 2) assumption; 3)

agency; 4) veil-piercing/alter ego; and 5) estoppel. Id. at 776; see also Arthur Andersen LLP v.

Carlisle, 556 U.S. 624, 631 (2009) (explaining that "'traditional principles' of state law allow a

contract to be enforced by or against nonparties through 'assumption, piercing the corporate veil, alter

ego, incorporation by reference, third-party beneficiary theories, waiver and estoppel'"). A party "is

estopped from denying its obligation to arbitrate when it receives a 'direct benefit' from the contract

containing an arbitration clause." American Bureau of Shipping v. Tencara Shipyard, 170 F.3d 349,

353 (2d Cir. 1999) (finding estoppel where a shipyard's contract with a safety and design classification

organization led to a "direct benefit" for the non-signatory owners, namely, lower insurance rates and

the ability to sail under a foreign flag); see also LaRoss Partners v. Contact 911, 874 F. Supp. 2d 147

(E.D.N.Y. 2012) (defining "direct" benefits as ones that "flow directly from the agreement" and

"indirect" benefits as "incidental to the contract," occurring when the "non-signatory benefits from the

contractual relationship between the signatories but not the contract itself"). In this case, Octavia

Lovelace has received a "direct benefit" from the Retail Instalment Contract – namely, the financing

for, and ultimately the use of, the car.

The cases relied on by plaintiffs on this issue differ from the one at hand. In those cases, there

were multiple unrelated plaintiffs suing the same defendants on different contracts. See, e.g., Lafayette

Texaco, Inc. v. Smith, No. 08 CV 406, 2010 WL 653494, at *4 (M.D. Ala. Feb. 19, 2010); Midwest

16

Financial Holdings, LLC v. P&C Ins. Systems, Inc., No. 07-3156, 2007 WL 4302436, at *4 (C.D. Ill. Dec. 7, 2007). Some of the contested contracts between the plaintiffs and the defendants contained arbitration provisions while others did not. Id. The Lafayette and Midwest courts compelled arbitration for some, but not all, of the plaintiffs in those cases depending on what their contracts provided. See Lafayette Texaco, Inc. v. Smith, 2010 WL 653494, at *4 (finding that "although it makes perfect sense, in terms of judicial economy, to arbitrate all of the plaintiffs' claims together because they bring identical claims" against the defendant, because two of the plaintiffs each had their own distinct contracts with the defendant, the defendant was "entitled to arbitrate with only the [plaintiffs] that agreed to do so in contract"); Midwest Financial Holdings, LLC v. P&C Ins. Systems, Inc., 2007 WL 4302436, at *4 (compelling arbitration for one of the plaintiffs and the defendant based on their signed licensing agreement, but denying defendant's motion to compel arbitration where the other plaintiffs did not have a similar agreement).

In this case, on the other hand, both William and Octavia Lovelace's claims emerge from the same contract. Thus, because Octavia received a direct benefit from the Instalment Contract and her claims in this action, like William's claims, arise from this same Instalment Contract, the Court respectfully recommends that Octavia Lovelace be compelled to arbitrate her claims as well. An arbitration agreement must be enforced "notwithstanding the presence of other persons who are parties to the underlying dispute but not to the arbitration agreement." Cosmotek Mumessillik Ve Ticaret Ltd. Sirkketi v. Cosmotek USA, Inc, 942 F. Supp. 757, 760 (D. Conn. 1996) (quoting Moses H. Cone Memorial Hosp. v. Mercury Constr., 460 U.S. 1, 20, 103 (1983)).

Accordingly, for the reasons set forth above, the Court respectfully recommends that defendant's motion to compel arbitration be granted as to both plaintiffs.

17

## II.   Motion to Dismiss

Defendant moves to dismiss the plaintiffs' claims in favor of arbitration, but plaintiffs argue that a stay is appropriate. (Def.'s Mem. at 13–14; Pls.' Mem. at 9). The Second Circuit recently clarified that in the case of a motion to dismiss based on an agreement to arbitrate, courts should grant a mandatory stay pending arbitration instead of granting the motion to dismiss. Katz v. Cellco Partnership, 794 F.3d 341, 346 (2d Cir. 2015). A mandatory stay enables parties to "proceed to arbitration directly, unencumbered by the uncertainty and expense of additional litigation, and generally precludes judicial interference until there is a final award." Id. at 346. The text of the FAA itself provides that "upon any issue referable to arbitration under an agreement in writing for such arbitration, the court in which the suit is pending, upon being satisfied that the issue involved in such suit or proceeding is referable to arbitration under such an agreement, shall on application of one of the parties stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement." 9 U.S.C. § 3; see generally Carvant Fin. LLC v. Autoguard Advantage Corp., 958 F. Supp. 2d 390, 398 (E.D.N.Y. 2013) (applying Section 3 of the FAA).

Since the TILA claims confer subject matter jurisdiction on this court, it is respectfully recommended that the action be stayed and that the court retain jurisdiction over this matter for the limited purpose of reviewing the arbitration award.[8]

---

[8] Defendant asks this Court to transfer the matter to state court per the Vehicle Purchase Agreement and the Customer Acknowledgment form if the Court does not compel arbitration. (Def.'s Mem. at 1). However, since the Court in this case does compel arbitration, the Court need not address defendant's alternative arguments for transferring the matter to state court.

## CONCLUSION

In light of the foregoing, the Court respectfully recommends that Showroom's motion to compel arbitration be granted as to both plaintiffs. It is further recommended that the Court issue a stay pending the outcome of the arbitration. The Court respectfully recommends that the defendant's motion to dismiss plaintiffs' claims be denied without prejudice at this time.

Any objections to this Report and Recommendation must be filed with the Clerk of the Court, with a copy to the undersigned, within fourteen (14) days of receipt of this Report. Failure to file objections within the specified time waives the right to appeal the District Court's order. See 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; Caidor v. Onondaga Cty, 517 F.3d 601, 604 (2d Cir. 2008).

The Clerk is directed to send copies of this Report and Recommendation to the parties either electronically through the Electronic Case Filing (ECF) system or by mail.

**SO ORDERED**.

Dated: Brooklyn, New York
     September / 2017

                                   /s/ Cheryl Pollak

                               Cheryl L. Pollak
                               United States Magistrate Judge
                               Eastern District of New York

# Exhibit D

## Brian L. Bromberg

| | |
|---|---|
| **From:** | ecf_bounces@nyed.uscourts.gov |
| **Sent:** | Tuesday, October 10, 2017 4:04 PM |
| **To:** | nobody@nyed.uscourts.gov |
| **Subject:** | Activity in Case 1:16-cv-04978-ERK-CLP Lovelace et al v. Showroom Auto, LLC Order Adopting Report and Recommendations |

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**

**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### Eastern District of New York

## Notice of Electronic Filing

The following transaction was entered on 10/10/2017 at 4:03 PM EDT and filed on 10/10/2017

| | |
|---|---|
| **Case Name:** | Lovelace et al v. Showroom Auto, LLC |
| **Case Number:** | 1:16-cv-04978-ERK-CLP |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**ORDER ADOPTING REPORT AND RECOMMENDATIONS The report and recommendation of the Magistrate Judge, unopposed, is adopted in it's entirety. Showroom's motion to compel arbitration be granted as to both plaintiffs; the case is stayed pending the outcome of the arbitration; and the defendant's motion to dismiss plaintiffs' claims is denied without prejudice and with leave to renew. Ordered by Judge Edward R. Korman on 10/10/2017. (Susi, PaulaMarie)**

**1:16-cv-04978-ERK-CLP Notice has been electronically mailed to:**

Brian L. Bromberg     brian@brianbromberg.com, brian.bromberg@gmail.com, mike@bromberglawoffice.com

Ira B. Pollack     irabpollack@yahoo.com

Daniel Scott Blinn     dblinn@consumerlawgroup.com, dorapfernandez@consumerlawgroup.com, lminer@consumerlawgroup.com

**1:16-cv-04978-ERK-CLP Notice will not be electronically mailed to:**