# Exhibit 2

AMERICAN ARBITRATION ASSOCIATION

| | | |
|---|---|---|
| WILLIAM J. LOVELACE and | : | |
| OCTAVIA LOVELACE | : | |
| Plaintiffs, | : | Case No.: 01-17-0006-3311 |
| | : | |
| v. | : | |
| | : | JULY 26, 2018 |
| | : | |
| SHOWROOM AUTO, LLC | : | |
| Defendant | : | |
| | : | |

## CLAIMANTS' PRE-HEARING MEMORANDUM

## INTRODUCTION

This is a suit brought by two consumers under the Truth in Lending Act ("TILA"),

15 U.S.C. § 1601, *et seq.*, and under New York General Business Law ("GBL") §§ 349

and 350 against an automobile dealership.


## SUMMARY OF FACTUAL ALLEGATIONS

The following facts may be found by the arbitrator based upon testimony and

documents to be presented by the Claimants.

On or about April 7, 2016, Octavia Lovelace ("Octavia") saw an advertisement on

Showroom Auto's website and www.usedcarsgroup.com for a 2014 Mercedes Benz

C300 (the "Vehicle"). The advertised price was $23,981. After contacting Showroom

Auto to confirm that the Vehicle was still available, Octavia and her father, William

Lovelace ("William", collectively "Claimants"), travelled to the dealership and met with a

Showroom Auto salesman.

1

Claimants discussed the Vehicle with Showroom Auto personnel, who confirmed that the cash price of the Vehicle was $23,981. Claimant told Showroom Auto that she had $10,000 to put down for the purchase of the Vehicle.

Showroom Auto suggested to Octavia that the car be put in only William's name due to Octavia's credit, but Showroom Auto knew and understood that Octavia would be the primary driver and would be making payments for the Vehicle. The salesman at Showroom Auto told Octavia that she did not get approved for financing, but William had been approved, and they would need to put an additional $1,000 down. Octavia did not have an additional $1,000 at the time of purchase, and Showroom Auto agreed to accept the payment in two weeks and provided Octavia with a form to sign that permitted Showroom Auto to take the additional $1,000 from Octavia's bank account in two weeks.

Showroom Auto prepared a Retail Instalment Contract (the "Contract) that listed William as the Buyer and did not contain a Co-Buyer, even though it knew that Octavia would be making the payments under the Contract. The Contract listed a cash price of $33,180.00, including $2,704 in sales tax, an amount that was substantially more than the agreed upon price. Exeter Finance Corp. ("Exeter") is a subprime finance company that imposed costs upon Showroom Auto to take assignment of the Contract or otherwise did not pay the full amount financed at the time of assignment. Showroom Auto passed these, and other charges, on to Claimants, but failed to disclose them as finance charges. Instead, it buried the charges in the cash price of the Vehicle in violation of TILA and NY GBL §§ 349 and 350.

2

Showroom Auto rushed William through the signing of the Contract, and he did not notice that the price being charged was substantially greater of the agreed upon price and that the amount financed was $22,620. Showroom Auto failed to provide Octavia or William with a copy of a Buyers Order for the Vehicle.

In the present action, the Defendant has made no effort to challenge the essential allegations asserted against it under TILA or NY GBL §§ 349 and 350. Earlier in these proceedings, Bernard Chris Mercus, the general manager of Showroom Auto, submitted a declaration ("Mercus Declaration") in support of a motion to dismiss under Fed. R. Civ. P. 12(b)(6). The Mercus Declaration contains admissions that establish the Respondent's liability under TILA with greater specificity than even alleged in the underlying complaint.

Specifically, paragraph 20 of that Declaration provides an itemization of the "total cash price on delivery to customer" charged to William Lovelace, and it includes a charge of $1,340 as a "dealer financing fee." This dealer financing fee was included in the $33,620 total cash price. Consequently, Respondent has admitted that it included a $1,340 "dealer financing fee" in the amount financed. In Paragraph 19 of that declaration, Mercus states that the purpose of that "[t]he dealer's fee to arrange financing was $1,340." Therefore, this charge would not have been present in a comparable cash transaction and it satisfies the definition of "finance charge."

The Contract disclosed an amount financed of $22,620, an annual percentage rate of 16.70%, a total finance charge of $15,462.96, and provided for 72 monthly payments of $528.93 commencing May 22, 2016. The Contract was assigned to Exeter.

3

After receiving the first Exeter invoice and learning that the balance owed was $22,620, Octavia contacted Showroom Auto's general manager, Chris, who claimed that the price included a service contract and an "extended warranty" and a fee for "reconditioning" the Vehicle, although no reconditioning fee had been disclosed by Showroom Auto and no warranty agreement or service contract had been itemized on the Contract or provided to the Plaintiffs. If a service contract was registered in this transaction, this occurred without Plaintiffs' knowledge, and no service contract has been provided to them.

The Mercus Declaration further shed light on this itemization, but also made a portion of the increased price more inscrutable. According to Paragraph 20 of that declaration, the balance of the increased price was attributable to a $2,995 charge for "Used Vehicle Recon. Fee and Prep". However, Mercus also declared that there was a $2,160 charge for "Theft Deterrent Protection (Anti-theft Etch)". At this point, Showroom Auto has provided several different explanations for what this portion of the increased price can be attributed. Thus, it is doubtful that a service contract, "extended warranty" or "Theft Deterrent Protection (Anti-theft Etch)" actually exists for this Vehicle. And, by failing to provide Octavia or William with copies of whatever policy is in place, it would be nearly impossible for them to use a service for which they were charged over $2,000. Showroom Auto has not produced documents in these proceedings evincing the existence of any of these services for Claimants or the Vehicle. Moreover, if this fee was

for a VIN etch, this charge is particularly egregious, because this service is available for

free from New York City Police Department ("NYPD").[1]


**LEGAL CLAIMS**

    **a. Truth in Lending Act**

        TILA is a remedial, strict liability statute that is to be liberally construed, and it

requires no proof of deception or actual damages to obtain relief thereunder.[2]  Any

defects in the disclosure process, even technical defects, must be recognized without

requiring any proof that the consumer was confused.[3]

        TILA's purpose is to ensure the accurate and meaningful disclosure of the cost of

consumer credit and to enable consumers to make informed choices in the credit

marketplace. Our Supreme Court noted in *Mourning v. Family Publication Services,*

*Inc.*[4] that unscrupulous merchants might attempt to circumvent TILA's objectives by

"burying the cost of credit in the price of the goods sold". The Court gave an example of

how a merchant might attempt to avoid the disclosure requirements:

> Two merchants might buy watches at wholesale for $20 which normally sell
> at retail for $40.  Both might sell immediately to a consumer who agreed to
> pay $1 per week for 52 weeks.  In one case, the merchant might claim that
> the price of the watch was $40 and that the remaining $12 constituted a
> charge for extending credit to the consumer.  From the consumer's point of
> view, the credit charge represents the cost which he must pay for the
> privilege of deferring payment of the debt he has incurred.  From the
> creditor's point of view, much simplified, the charge may represent the
> return which he might have earned had he been able to invest the

---

[1] "Charging for Free VIN-Etching Might Soon Be Costly Business", Keach Hagey, Queen Chronicle, Oct. 9, 2003 available at http://www.qchron.com/editions/north/charging-for-free-vin-etching-might-soon-be-costly-business/ (Last accessed July 2, 2018).
[2] *Purtle v. Eldridge Auto Sales*, 91 F.3d 797, 800 (6th Cir. 1996); *McGowan v. King, Inc.,* 569 F.2d 845, 848-49 (5th Cir. 1978); *Redhouse v. Quality Ford Sales, Inc.*, 523 F.2d 1, 2 (10th Cir. 1975) (*en banc*).
[3] *See Jenkins v. Landmark Mortgage Corp.*, 696 F. Supp. 1089, 1092, 1095 (W.D. Va. 1988) (citing *Powers v. Sims and Levin*, 542 F.2d 1216, 1219 (4th Cir. 1976)).
[4] *Mourning v. Family Publications Serv.*, Inc., 411 U.S. 356, 366 (1973).

proceeds from the sale of the watch from the date of the sale until the date of payment.  The second merchant might claim that the price of the watch was $52 and that credit was free.  The second merchant, like the first, has forgone the profits which he might have achieved by investing the sale proceeds from the day of the sale on.  The second merchant may be said to have 'buried' this cost in the price of the item sold.  By whatever name, the $12 difference between the total payments and the price at which the merchandise could have been acquired is the cost of deferring payment.

The Supreme Court further elucidated that the Federal Reserve Board promulgated regulations (Regulation Z) to prohibit this well documented practice against a legislative background acknowledging this concern.  Reg. Z addresses the burying of a "finance charge" as part of the "cash price" by its definition of these terms. Cash price is defined as:

The price at which a creditor, in the ordinary course of business, offers to sell for cash the property or service that is the subject of the transaction. At the creditor's option, the term may include the price of accessories, services related to the sale, service contracts and taxes and fees for license, title, and registration.  The term does not include any finance charge.

"Finance charge" is defined broadly in Reg. Z to include both direct and indirect amounts paid as an incident to or a condition of the extension of credit.  Reg. Z, § 226.4(a), provides as follows:

The finance charge is the cost of consumer credit as a dollar amount.  It includes any charge payable directly or indirectly by the consumer and imposed directly or indirectly by the creditor as an incident to or a condition of the extension of credit.  It does not include any charge of a type payable in a comparable cash transaction.

The regulatory scheme therefore requires sellers to separate the cash price of goods sold on credit from charges that are imposed as an incident of the extension of credit and that are not charged in a comparable cash transaction; those charges must be disclosed as finance charges.

Showroom Auto violated TILA in two ways. First, Showroom Auto increased the purchase price of the Vehicle on account of William's credit. This additional $1,340 charge would not have been incurred in a similar cash transaction. Showroom Auto has admitted that this charge was incidental to the providence of credit, since it a fee to arrange credit would not be included in a comparable cash transaction.[5] However, Showroom Auto failed to accurately include that charge as part of the finance charge and instead listed it as part of the amount financed. As described in the above hypothetical in *Mourning*, Showroom Auto buried the cost of financing as part of the amount financed. Therefore, the disclosures provided to Claimants inaccurate described the credit transaction.

Additionally, if a service contract, extended warranty or some kind of theft-deterrent service was included, Showroom Auto violated TILA by not separately itemizing the costs of those contracts within the itemization of the amount financed that it provided to William. Under 12 CFR § 1026.18(c)(iii), the amount financed must itemize amounts paid to other persons, such as the service contract company, on the consumer's behalf by the creditor. This Contract did not comply with that regulation. Alternatively, if some kind of contract was not included, Showroom Auto violated TILA by requiring William to pay the cost of that undelivered contract as a condition of financing, and those costs should have been disclosed as finance charges.

---

[5] It is unclear before an evidentiary hearing whether the $1,340 charge is the amount charged by Exeter and simply passed on to William, or if Showroom Auto charged an additional fee on top of Exeter's fee for its services with respect to arranging credit. Regardless, the fee was only included in the transaction because the purchase was financed and should have probable been disclosed as a finance charge.

**b. NY General Business Law §§ 349 (deceptive practices) and 350 (false advertising)**

Under GBL § 349, deceptive acts or practices in the conduct of any business in the State of New York are unlawful. GBL § 349. To show a violation of GBL § 349, a plaintiff must show that:

- The act or practice complained of was consumer-oriented;

- The act or practice was misleading in a material respect; and

- The plaintiff was injured as a result of the deceptive act or practice.

*Stutman v. Chemical Bank*, 95 N.Y.2d 24, 29 (2000).

A plaintiff does not need to establish a defendant's intent to defraud or prove justifiable reliance. *Oswego Laborers' Local 214 Pension Fund v. Marine Midland Bank*, 85 N.Y.2d 20, 25-26 (1995). Under GBL § 349(h), "[t]he court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damage up to one thousand dollars, if the court finds the defendant willfully or knowingly violated this section [i.e., GBL § 349]." In addition to this "civil penalty," courts can award punitive damages under GBL § 349 for egregious conduct. *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167, 893 N.Y.S.2d 208, 218 (2d Dep't 2010); *Barkley v. Olympia Mortg. Co.*, 557 Fed. Appx. 22, 26 fn. 1 (2d Cir. 2014) (unpublished summary order) ("United Homes also argues that punitive damages are not available for violation of Section 349 of New York General Business Law ("GBL § 349")…However, punitive damages may be awarded for a violation of GBL § 349, *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167, 893 N.Y.S.2d 208 (2010)…"); *JD & K Assoc., LLC v. Selective Ins. Group, Inc.*, 118 A.D.3d 1402, 988 N.Y.S.2d 749 (App. Div. 4th Dep't 2014 ); *Barkley v. United Homes, LLC*, 2012 WL 2357295 (E.D.N.Y. 2012).

As the leading authorities on GBL § 349, the Honorable John M. Leventhal, Associate Justice of the Appellate Division, Second Department, and the Honorable Thomas A. Dickerson, who sat on the Appellate Division, Second Department until this month, have observed: "Although treble damages are limited to $1,000, New York courts and the legislature have set no such limit on punitive damages in GBL section 349 claims." John M. Leventhal & Thomas A. Dickerson, Punitive Damages: Public Wrong or Egregious Conduct? A Survey of New York Law, 76 Alb. L. Rev. 961, 1005 (2013).

Justices Leventhal and Dickerson give the example of the Appellate Division, Second Department, case of *Wilner v. Allstate Ins. Co.*, 71 A.D.3d 155, 167, 893 N.Y.S.2d 208, 218 (App. Div. 2d Dep't 2010), in which an insurance company failed to protect its insured against third-party claims as required under a homeowner's insurance policy. The Second Department held that "any consumer holding this policy, whose loss is potentially attributable to a third party, is required to protect the defendant's rights. Therefore, the conduct complained of has 'broad impact on consumers at large' and was thus consumer-oriented." *Wilner*, 71 A.D.3d at 164, 893 N.Y.S.2d at 216 (citing N.Y. Univ. v. Cont'l Ins. Co., 87 N.Y.2d 308, 320 (1995)). The Second Department then went on to deny the insurance company's motion to dismiss the plaintiff's demand for punitive damages, noting that "[a]n award of punitive damages is warranted where the conduct of the party being held liable 'evidences a high degree of moral culpability, or where the conduct constitutes willful or wanton negligence or recklessness." *Id.* at 167, 893 N.Y.S.2d at 218 (quoting *Pellegrini v. Richmond Cnty.*

*Ambulance Serv., Inc.*, 48 A.D.3d 436, 437, 851 N.Y.S.2d 268, 269 (App. Div. 2d Dep't 2008)).

Justices Leventhal and Dickerson further cited with approval the Third Department case of *Bianchi v. Hood*, 128 A.D.2d 1007, 513 N.Y.S.2d 541 (App. Div. 3d Dep't 1987), in which the Court affirmed a $5,000 award of punitive damages to a plaintiff who was awarded only $300 for ejectment by unlawful eviction, consisting of $1,000 for pain and suffering, aggravation and mental distress, $200 for trespass, and $250 for breach of the warranty of habitability. The court trebled the damages for ejectment and pain and suffering under Real Property Actions and Proceedings Law § 853. *Id.* at 1007, 513 N.Y.S.2d at 541. The Third Department reasoned that a relatively large award of punitive damages was justified because there was "a flagrant, unlawful interference by defendant with plaintiff's right to enjoy and possess her leased premises . . . [where] [d]efendant moved plaintiff's possessions without her permission from the apartment she had leased to her . . . done contrary to plaintiff's express written instructions to the contrary." *Id.* at 1008, 513 N.Y.S.2d at 542.

In sum, punitive damages are available under GBL § 349 for conduct that is willful, wanton or reckless. Punitive damages under § 349 are uncapped and are available separate and apart from and statutory damages or trebling. While there is no public harm requirement for the awarding of punitive damages under § 349, proving claims under § 349 requires showing that conduct complained of was "consumer-oriented," involving the type of conduct that could impact the public.

Most recently, in a decision last month in *Gonzalez-Vasquez v. Mayors Auto Group-Woodside, LLC,* 60 Misc.3d 1211(A) (S.Ct., Bx. Cnty 2018), attached as Exhibit

A, the Honorable Mary Ann Briganti, of the Supreme Court, Bronx County, held that

punitive damages may be available in cases involving automobile fraud by car

dealerships. Judge Briganti summarized the relevant facts as follows:

> In this case, Plaintiffs here allege that defendants engaged in "bait-and-switch" advertising and induced plaintiff to sign a series of blank contracts, refused to refund her full deposit amount and then attempted to have plaintiff sign a waiver or general release agreeing to discharge defendants from liability, and also acknowledging that plaintiff made an illegal audio recording of defendants and to assume liability in litigation if the audio recordings surfaced. Accepting these allegations as true, they are sufficient to alleged conduct that was willful, wanton, and transcended 'mere carelessness' so as to warrant punitive damages. Furthermore, Plaintiffs adequately allege consumer-oriented conduct that would have a broad impact on consumers at large.

*Id.*, at *2 (citations omitted).

Under GBL § 350, "False advertising in the conduct of any business, trade or

commerce or in the furnishing of any service is hereby declared unlawful."

Here, Showroom Auto violated GBL §§ 349 and 350 by failing or refusing to sell

the Vehicle for its advertised price. Plaintiffs relied upon the false and deceptive

advertising. In other words, Showroom Auto violated these GBL sections by using bait-

and-switch advertising.

Additionally, William signed the Contract and agreed to be liable for the

payments for Octavia's Vehicle without compensation, and he is a "Co-Signor" within

the meaning of the Federal Trade Commission's Credit Practices Rule, 16 C.F.R. §

444.3. Showroom Auto violated the GBL when it obligated William without first informing

him of the nature of his liability as co-signor, a violation of 16 C.F.R. § 444.3(a)(2).

Showroom Auto also violated the GBL when it did not provide William with a copy of the

Notice to Co-Signor required by 16 C.F.R. § 444.3(c).

Showroom Auto further violated the New York General Business Law ("GBL") § 349 by failing to provide Plaintiff with the Buyers Order, Buyer's Guide and other contract documents for at the time he signed the Contract.

Car dealers frequently employ these scams, and courts have held repeatedly that both bait-and-switch advertising and the use of contracts with blank terms violate GBL § 349. *Cuomo v. Dell, Inc.*, 21 Misc. 3d 1110(A), 873 N.Y.S. 2d 236 (Albany Sup. 2008); *The People of the State of New York v. Giuffre Motor Car*, et al. Index No. 30163/2010 J. Graham Sup. Ct. Kings County decided December 7, 2011, attached as Exhibit B. (Car dealers' practices of using bait and switch advertising, inducing consumers to sign blank contracts, and collecting deposits that were never returned all violated GBL § 349).

Showroom Auto runs a business selling hundreds, if not thousands, of automobiles a year. It may be presumed that Showroom Auto does not invent a new scam every time customers like the Lovelaces walk in the door. To take only the most blatant example of fraud, the Lovelaces cannot be the first consumers whom Showroom Auto charges $2,160 for a VIN-etch service that is available for free from the NYPD.

### c.  Common Law Fraud

Under New York law, a plaintiff must establish five required elements to prevail on a claim of fraud. More specifically, "a plaintiff must show th[e following]: (1) the defendant made a false representation of a material fact; (2) with knowledge of its falsity; (3) with scienter, namely an intent to defraud the plaintiff; (4) and upon which the plaintiff justifiably relied; (5) thereby causing damage to the plaintiff." *See Cofacredit, S.A. v. Windsor Plumbing Supply Co.*, 187 F.3d 229, 239 (2d Cir.1999). Moreover, New

York recognizes a right to punitive damages in fraud cases where "the defendant has committed a gross, wanton, or willful fraud or other morally culpable conduct in a sufficiently high degree." *New York Pattern Jury Instr.—Civil*, 3:20 (2010); *Giblin v. Murphy*, 73 N.Y.2d 769, 771, 536 N.Y.S.2d 54, 532 N.E.2d 1282 (1988).

As set forth at length above, this was not a case of failing to disclose that a car had been in an accident. This was a straightforward case of negotiating one deal and having the consumer sign another, radically different deal at a much higher price. No contract term could be more material than price. Knowledge of the scam by Showroom Auto is reflected by the mere act of inflating the price and having Mr. Lovelace sign the contract reflecting the false deal. Scienter is revealed not only by the brazenness of the scam reflected in the Retail Installment Contract – *e.g.*, by the $2,160 VIN-etch service – but by the recordings of the dealership's employees trying to justify what they did to the Lovelaces. These recordings will be played for the Arbitrator during the hearing next month.

### d. Attorney's Fees

Consumers are to be awarded TILA attorney fees in "any successful action."[6] The award, under TILA, is mandatory.[7] Because the federal and state governments lack the resources to adequately police the marketplace and to protect consumers, federal and state consumer protection laws depend upon the private enforcement by aggrieved

---

[6] 15 U.S.C. § 1640(a)(3).

[7] *Christianburg Garment Co. v. Equal Employment Opportunity Comm'n*, 434 U.S. 412, 415 n.5, 98 S.Ct. 694, 54 L.Ed. 2d 648 (1978) (Title VII); *see also Diaz v. Paragon Motors of Woodside, Inc.*, No. CV-03-6466 CPS RML, 2007 WL 2903920, at *7 (E.D.N.Y. Oct. 1, 2007) *citing Nigh v. Koons Buick Pontiac GMC, Inc.*, 478 F.3d 183, 188 (4th Cir. 2007).

consumers.[8] The ability of consumers to bring such cases depends upon the availability of private attorneys willing to bring these cases against well-heeled businesses. Accordingly, TILA provides that successful litigants are entitled to recover a reasonable attorney's fee based upon the work performed in the case, not based upon the amount recovered.[9] The availability of such fees enables private attorneys to handle cases that involve small dollar amounts, but which raise complex legal issues. Since businesses can avoid court proceedings by inserting pre-dispute arbitration clauses in their contracts, it is particularly important that arbitrators enforce these fee provisions. Otherwise, there will be no check on businesses that shirk their warranty obligations and violate consumer protection laws. The technical and complex issues presented in this and similar matters are abstruse and would severely disadvantage consumers if they were forced to proceed in these arbitrations *pro se* against represented businesses.

An award of attorney's fees is available to Claimants even if they do not prevail on every issue raised, because all the claims arise from the same transaction and conduct, i.e., Showroom Auto's overcharging for the Vehicle and failing to properly disclose and itemize the nature of the charges.[10] Reasonable attorney fees are also available to a prevailing plaintiff under GBL § 349(h).

---

[8]*Diaz,* supra at *7 *citing Nigh v. Koons Buick Pontiac GMC, Inc.,* 384 F.Supp.2d 915, 919 (E.D.Va.2005); *see also de Jesus v. Banco Popular de Puerto Rico,* 918 F.2d 232, 233 (1st Cir.1990)), aff'd in part and vacated in part, 458 F.3d 183 (4th Cir.2007);  *New Century Mortgage Corp. v. Payton,* 2004 WL 524693, at *1 (N.D.Ill. March 11, 2004) ("In enacting the Truth in Lending Act, Congress contemplated that the statute would be enforced by private litigants acting as private attorneys general") (internal quotation marks and citations omitted).

[9] *Purtle v. Eldridge Auto Sales, Inc.,* 91 F.3d 797, 802 (6th Cir.1996) (Under TILA "[t]he attorney's fees are not limited by the amount of [plaintiff's] recovery"), *cert. denied,* 520 U.S. 1252, 117 S.Ct. 2411, 138 L.Ed.2d 177 (1997).

[10] *Hensley v. Eckerhart,* 461 U.S. 424 (1983); *LeBlanc-Sternberg v. Fletcher,* 143 F.3d 748 (2d Cir. 1998) (Attorney's fees available when claims intertwined); *Dominic v. Consolidated Edison Co.,* 822 F.2d 1249,

14

As agreed at the Prehearing Conference, the arbitration will remain open so that the specific fee request will be submitted following the hearing.

Dated:        July 26, 2018

                                   PLAINTIFFS, WILLIAM J. LOVELACE
                                   And OCTAVIA LOVELACE

                                   By: /s/ *Daniel S. Blinn*_____
                                           Daniel S. Blinn
                                           One of Plaintiffs' Attorneys

                                   By: /s/ Brian Bromberg_____
                                           Brian Bromberg
                                           One of Plaintiffs' Attorneys


**Attorneys for Plaintiff**

Daniel S. Blinn
Brendan L. Mahoney
Consumer Law Group, LLC
35 Cold Spring Rd. Suite 512
Rocky Hill, CT  06067
Tel: (860) 571-0408

Brian L. Bromberg
Bromberg Law Office, P.C.
26 Broadway, 21st Floor
New York, NY 10004
Tel: (212) 248-7906

---

1259-60 (2d Cir. 1987) (fully compensatory fee proper where factual basis and legal theories same throughout); *United States Football League v. National Football League,* 887 F.2d 408, 415 (2d Cir. 1989) (common core of facts and law).

EXHIBIT A

60 Misc.3d 1211(A)
Unreported Disposition
NOTE: THIS OPINION WILL
NOT APPEAR IN A PRINTED
VOLUME. THE DISPOSITION
WILL APPEAR IN THE REPORTER.
Supreme Court, Bronx County, New York.

Jacquelyne GONZALEZ-VASQUEZ,
on behalf of herself and as a parent on
behalf of her infant child S.S., Plaintiffs,
v.
MAYORS AUTO GROUP-
WOODSIDE, LLC, et al., Defendants.

23677/2014E
|
Decided June 15, 2018

**Attorneys and Law Firms**

Attorneys for Plaintiffs: Brian L. Bromberg, Bromberg Law Office, P.C., NYC, Matthew Schedler, Divya Subrahmanyam, CAMBA Legal Services, Brooklyn, NY

Attorneys for Defendants: Salmon Ricchezza Singer & Turchi, LLP (Robyn D. Kazatsky, Esq.)

**Opinion**

Mary Ann Brigantti, J.

*1 The following papers numbered 1 to 8 read on the below motion noticed on January 24, 2017 and duly submitted on the Part IA15 Motion calendar of **March 28, 2018**:

Papers Submitted Numbered

Pl.'s Notice of Motion, Exhibits 1,2

Def.'s Cross-Motion, Memo. Of Law., Exhibits, 3,4

Pl.'s Reply Aff., Opp. to Cross-Motion, Exhibits 5,6

Defs.' Reply Aff. In Further Support, Opp., Exhibits 7,8

Upon the foregoing papers, defendants Mayors Auto Group Worldwide LLC, d/b/a City Mitsubishi Saab, Nick Letsios, Hector Suarez, and Andrew Beswick (collectively, "Defendants") cross-move for an order (1) pursuant to CPLR 3211, dismissing the plaintiffs' claims for punitive damages, with prejudice; (2) denying the plaintiffs' motion to compel discovery, and/or (3) staying discovery regarding punitive damages until after a determination has been made as to whether punitive damages are appropriate, and/or (4) granting such other and further relief as this court deems just and proper. The plaintiffs Jacquelyne Gonzalez-Vasquez, on behalf of herself as a parent and on behalf of her infant child S.S. ("Plaintiff") opposes the cross-motion.

On a motion to dismiss pursuant to CPLR 3211(a)(7), a court's role is ordinarily limited to determining whether the complaint states a cause of action (*Frank v. DaimlerChrysler Corp.*, 292 AD2d 118 [1st Dept. 2002] ). In other words, the determination is not whether the party has artfully drafted the pleading, but whether deeming the pleading to allege whatever can be reasonably implied

Gerald v. Oakwood Mayfair Kings Point Consult, LLC, Slip Copy (2018)

60 Misc.3d 1211(A), 2018 N.Y. Slip Op. 51068(U)

from its statements, a cause of action can be sustained (See *Stendig, Inc. v. Thom Rock Realty Co.*, 163 AD2d 46 [1st Dept. 1990]; *Leviton Manufacturing Co., Inc. v. Blumberg*, 242 AD2d 205 [1st Dept. 1997] [on a motion for dismissal for failure to state a cause of action, the court must accept factual allegations as true] ). When considering a motion to dismiss for failure to state a cause of action, the pleadings must be liberally construed (*see*, CPLR 3026). The court must "accept the facts as alleged in the complaint as true, accord plaintiffs the benefit of every possible favorable inference, and determine only whether the facts as alleged fit into any cognizable legal theory"(*Leon v. Martinez*, 84 NY2d 83, 87-88 [1994] ). The motion should be denied if, from the pleading's four corners, factual allegations are discerned which taken together manifest any cause of action cognizable at law (*McGill v. Parker*, 179 AD2d 98 [1st Dept. 1992] ).

Punitive damages are available in "limited circumstances where it is necessary to deter defendant and others like it from engaging in conduct that may be characterized as 'gross' and 'morally reprehensible,' and of 'such wanton dishonesty as to imply a criminal indifference to civil obligations' " (*see New York University v. Continentical*, 87 NY2d 308, 315-16 [1995][*Rocanova v. Equitable Life Assur. Socy.*, 83 NY2d 603 [1994], quoting *Walker v. Sheldon*, 10 NY2d 401, 404 [1961] ] ).

 **\*2**  In this case, Plaintiff's complaint asserts causes of action which, proven to be true, may sustain their claims for punitive damages against defendants. Plaintiffs allege

that Defendants violated General Business Law ("GBL") § 349, which its broad in scope and prohibits deceptive and misleading business practices(*see Wilner v. Allstate Ins. Co.*, 71 AD3d 155, 159-160 [2nd Dept. 2010]; citing *Karlin v. IVF America, Inc.*, 93 NY2d 282 [1999] ). To state a cognizable claim under this section, a plaintiff must identify consumer-oriented misconduct which is deceptive and materially misleading to a reasonable consumer and which causes actual damages (*id* at 165 [internal citations omitted] ). Punitive damages may be awarded on a cause of action for violation of GBL § 349 where the complaint alleges conduct that "evidences a high degree of moral culpability, or where the conduct is so flagrant as to transcend mere carelessness, or where the conduct constitutes willful or wanton negligence or recklessness" (*id* at 167 [internal citations omitted] ). In this case, Plaintiffs here allege that defendants engaged in "bait-and-switch" advertising and induced plaintiff to sign a series of blank contracts, refused to refund her full deposit amount and then attempted to have plaintiff sign a waiver or general release agreeing to discharge defendants from liability, and also acknowledging that plaintiff made an illegal audio recording of defendants and to assume liability in litigation if the audio recordings surfaced. Accepting these allegations as true, they are sufficient to alleged conduct that was wilful, wanton, and transcended "mere carelessness" so as to warrant punitive damages. Furthermore, Plaintiffs adequately allege consumer-oriented conduct that would have a broad impact on consumers at large (*see Gaidon v.*

Case 1:16-cv-04978-ERK-CLP Document 44-4 Filed 11/19/18 Page 20 of 30 PageID #: 479
Gerald J. Vesce v. Mayors Kids Group (consult), LLC, Slip Copy (2018)

60 Misc.3d 1211(A), 2018 N.Y. Slip Op. 51068(U)

*Guardian Life Ins. Co. of Am*, 94 NY2d 330, 344 [1999] ).

Plaintiffs' amended complaint also contains a cause of action for conversion, which may warrant award of punitive damages even without a public harm where a plaintiff provides that defendant acted with "actual malice involving intentional wrongdoing" or its conduct amounted to "a wanton or reckless disregarded of plaintiff's rights" (*Boston Concessions Group, Inc. v. Criterion Center Group*, 250 AD2d 435 [1st Dept. 1998], citing *Giblin v. Murphy*, 73 NY2d 769 [1988] ). In this case, the same allegations that support Plaintiff's GBL § 349 claim also support their claim for conversion, as it may be inferred that defendants acted wilfully and maliciously when they refused to return Plaintiff's deposit.

Plaintiffs also assert a cause of action for false arrest and imprisonment, which may warrant punitive damages where there is evidence that defendant acted maliciously or recklessly (*see Hart v. City of New York*, 186 AD2d 398 [1st Dept. 1992]; *cf. Guion v. Associated Dry Goods Corp. (Lord and Taylor Division)*, 56 AD2d 798 [1st Dept. 1977] ). "[O]ne who wrongfully accuses another of criminal conduct and induces or procures that person's arrest may be liable for false arrest" (*see D'Elia v. 58-25 Utopia Parkway Corp.*, 43 AD2d 976, 978 [2nd Dept. 2007], quoting *Dunn v. City of Syracuse*, 83 AD2d 783 [4th Dept. 1981] ). In this case, Plaintiffs allege that the defendants told police that either plaintiff's husband or her children vandalized one

of defendants' cars located outside of the dealership. Defendants continued to demand that plaintiff executed a waiver/ general release, and they threatened to have plaintiff's child, SS, arrested at his school for scratching the car if she did not do so. Plaintiffs further allege that upon information and belief, one of the defendants thereafter reported to the police that SS had scratched a car on the lot, and SS was arrested while he was in school and taken to police custody for 5-6 hours. Later, all charges were dropped and a Notice of Declination was issued. The foregoing attestations sufficiently set forth a malicious conduct that would sustain a cause of action for both false arrest and punitive damages stemming from that tort. Defendant's reply submission of surveillance footage outside of the defendants' business does not conclusively show that SS scratched any vehicle and thus does not demonstrate any defense to plaintiff's cause of action. Furthermore, Defendants' submissions of an alleged phone call transcript between police and plaintiff does not constitute "documentary evidence" that conclusively establishes that plaintiffs have no cause of action (CPLR 3211[a][1] (see *Basis Yield Alpha Fund [Master] v. Goldman Sachs Group, Inc.*, 115 AD3d 128, 136 [1st Dept. 2014][internal citations omitted] ). There is insufficient evidence at this stage of the proceedings to determine whether the police acted on their own accord independent of allegedly false information provided by defendants when they arrested SS.

**\*3** A cause of action for defamation requires a (1) false statement (2) published

without privilege or authorization to a third party (3) constituting fault as judged by, at a minimum, a negligence standard, and (4) must either cause special harm or constitute defamation per se (*see Geraci v. Probst*, 61 AD3d 717, 719 [2nd Dept. 2009][internal quotations omitted] ). Punitive damages may be awarded on a defamation claim where the defendant-speaker was solely motivated by a desire to injure the plaintiff, and there is some evidence that this animus was "the one and only cause for the publication" (*see Morsette v. "The Final Call"*, 309 AD2d 249, 254 [1st Dept. 2003] ). Here, Plaintiffs' complaint alleges that defendants falsely reported to police that her son had committed a crime, and that defendants were motivated by a desire for plaintiff to sign a waiver or release in relation to the refund of her deposit. Upon a liberal reading of these allegations, the plaintiff adequately stated a cause of action for punitive damages predicated upon her defamation cause of action.

In light of the foregoing, Defendants' cross-motion to dismiss is denied.

Plaintiff's motion in chief to compel disclosure is respectfully referred to the Hon. Laura Douglas, J.S.C.

This constitutes the Decision and Order of this Court.

### All Citations

Slip Copy, 60 Misc.3d 1211(A), 2018 WL 3341227 (Table), 2018 N.Y. Slip Op. 51068(U)

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

EXHIBIT B

**SUPREME COURT OF THE STATE OF NEW YORK**   Index No. 30163/2010
**COUNTY OF KINGS: Part 36**                        Motion Calendar No.
                                                                       Motion Sequence No.

THE PEOPLE OF THE STATE OF NEW YORK, by
ERIC SCHNEIDERMAN, Attorney General of the
State of New York,

                   Petitioner,                       **DECISION/ORDER**

       -against-                                        Present:

Giuffre Motor Car Co., LLC. Giuffre Hyundai Ltd,      **Hon. Judge Bernard J. Graham**
(d/b/a Giuffre Hyundai), Giuffre Motor Car Co., LLC      Acting Supreme Court Justice
(d/b/a Giuffre Kia), Giuffre Auto Group, LLC,
(d/b/a Giuffre Mazda), Giuffre Autoworld, LLC,
(d/b/a Giuffre Mitsubishi), John Giuffre, individually
and as principal of Giuffre Motor Car Co., LLC,

               Respondents.

---

**Recitation, as required by CPLR 2219(a), of the papers considered in the review of this Motion to** : award
summary judgment.

| Papers | Numbered |
|---|---|
| Notice of Petition and Affidavits Annexed................................. | 1-2 |
| Order to Show cause and Affidavits Annexed.......................... | |
| Answering Affidavits...(Cross Motion to Dismiss/Affid/Memo) | 3 -4 -5 |
| Replying Affidavits...(and reply affirmation.).......................... | 6-7 |
| Exhibits....(Annexed to Petition) ........................................... | 8 |
| Other:    (Pet Reply Memorandum/Resp. Reply Memorandum) | 910 |

**Upon the foregoing cited papers, the Decision/Order on this application is as follows:**

Decision:

Petitioner, the State of New York by the Attorney General of New York State ("Petitioner"),
has brought this petition for an injunction, restitution, penalties and costs and other relief
pursuant to New York Executive Law Sec. 63(12) and New York General Business Law
("GBL") Section 349 and 350 against Respondents.

1

The Petitioner alleges that Respondents have engaged in deceptive and fraudulent business practices in violation of GBL Sec. 349 and false advertising in violation of GBL Sec. 350. A permanent injunction is sought under the authority of Executive Law Sec. 63(12), restraining such practices and a grant of restitution and damages to the injured parties as well as statutory costs.

Respondents are Giuffre Motor Car Co., LLC and John Giuffre, individually and as a principle of Giuffre Motor Car Co., LLC. Respondents also include four automobile dealerships which are subsidiaries of Giuffre Motor Car, LLC, to wit: Giuffre Hyundai Ltd., d/b/a Giuffre Hyundai; Giuffre Motor Car Co., LLC, d/b/a Giuffre Kia; Giuffre Auto Group, LLC, d/b/a Giuffre Mazda; and Giuffre Autoworld, LLC, d/b/a Giuffre Mitsubishi (collectively referred to as "Respondents" or Giuffre Respondents").

The Attorney General has submitted evidence in support of the petition for the purpose of proving that Respondents have violated Executive law Sec. 63(12) and General Business Law Sec's 349 and 350.

Respondents have opposed the petition and have submitted a cross-motion entitled "Notice of Motion and Objection in Point of Law to verified Petition".

Argument was heard in Part 36 of this Court on September 29, 2011 before the undersigned.

For the reasons set forth below, the Court finds that Respondents have violated Executive Law Section 63(12) and the General Business Law sections 349 and 350 by engaging in fraudulent and deceptive practices in connection with the sale of automobiles at the four dealerships owned by John Giuffre.

Discussion

Executive Law Sec. 63(12) authorizes the Attorney General to initiate a proceeding for the purpose of enjoining activities which are fraudulent or illegal and to obtain restitution and damages. It has been said that "Executive Law Sec. 63(12) was meant to protect not only the average consumer, but also the ignorant, the unthinking and the credulous". People v. General Elec. Co., 302 AD2d 314 (quoting Guggenheim v. Ginsburg, 43 NY2d 268, 273 (1977).

General Business Law Sec. 349 provides that "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state are hereby declared unlawful" GBL Sec. 349(a). GBL Sec. 349 and GBL Sec.350 (which applies the same prohibitions against false advertising) were enacted to protect consumers from unlawful business

2

practices and provide a means of redress for injuries suffered (see <u>Goshen v. Mutual Life Ins. Co.</u> <u>of New York</u>, 98 NY2d 314 (2002); <u>Oswego Laborers' Local 214 Pension Fund v. Marine</u> <u>Midland Bank</u>, 85 NY2d 20 (1995). Further, the Attorney General is afforded broad enforcement powers under the statute (see GBL Sec. 349(f)(g)).

The petition includes both affidavits and consumer complaints submitted to the Attorney General. The entire submission consists of twenty-six (26) affidavits and sixteen (16) complaints, each submitted by a separate individual. At this point it is necessary to consider the Respondent's argument that the proffered evidence is insufficient for this Court to award summary judgment due to several items being complaints that are not notarized and a few transactions which are barred by the applicable statute of limitations.

In reviewing the submissions, the Court concludes that the petition is supported by sufficient sworn statements to go forward in this matter. Addressing first the claim that the Petition includes complaints which are barred by the statute of limitations, the Court agrees with both parties that the applicable statute of limitations is three (3) years from the date of incident or occurrence. CLPL Sec. 214(2) provides a three year statute of limitations for a liability, penalty or forfeiture created or imposed by statute. The deceptive or fraudulent acts alleged here are considered statutory fraud and would, therefore, be subject to the three year period (see <u>Gaidon v.</u> <u>Guardian Life Insurance Co. Of Am.</u>, 94 NY2d 330 (1999); <u>Matter of People v. County Bank of</u> <u>Rehoboth Beach, De.</u>, 45 AD3d 1136 (3rd Dept. 2007); <u>Morelli v. Wider Nutrition Group</u>, 275 AD2d 607 (1st Dept. 2000). Furthermore, petitioner concedes that they only seek damages and restitution for those claims that fall within the period of Dec. 2007 to Dec. 10, 2010, the date of the filing of the Petition. By considering the affidavits submitted, and limiting those affidavits to transactions which took place three years prior to filing, the submission consists of nineteen (19) sworn statements which satisfy the summary judgment standards of the CPLR.

The other substantive argument raised by Respondent's counsel pertains to the admissibility of the consumer complaints annexed to the Petition. Respondent's counsel vigorously argues that this Court may not consider the Petition due to the inclusion of unsworn evidence. In their cross-motion to dismiss, Respondent cites several recent cases which have ruled against petitioners in matters in which unsworn testimony was offered (see <u>People v. City Model &</u> <u>Talent Dev.</u>, 29 Misc3d 1205(A) (Suffolk Co., 2010); and <u>People v. DBM Intl. Photo Corp.</u>, 135 AD2d 353 (1st Dept. 1987).

The Court has reviewed the cases cited by Respondent and notes that there are significant differences in the present case. Unlike the cited cases, in which the evidence consisted solely of

non-sworn statements, the evidence submitted in this case consists of nineteen (19) affidavits as well as sixteen (16) consumer complaints. Having submitted nineteen affidavits which are clearly admissible, the Petitioner has met its prima facie burden. It is also well settled that the Petitioner need only submit a sample or portion of the entire transactions conducted by Respondent to make a case for false or deceptive business practices (see State of New York v. Princess Prestige Co., 42 NY2d 104 (1977)).

The Court has reviewed the sixteen (16) consumer complaints which were signed by the complainants, subject to the penalties of perjury. Of the sixteen complaints, fourteen (14) complaints fall within the applicable three year statute of limitations. Based on the specificity of the complaints and the fact that each is signed subject to the penalties of perjury, the Court considers such complaints to be reliable and credible and may be considered as admissible evidence (together with the affidavits) for the purpose of seeking a summary judgment determination.

The alleged deceptive business practices and fraud consist of the "scratch-off" contest in which direct mailings are made to consumers, leading them to believe they had won a prize, but in fact, the "lucky winner" was merely enticed to visit the showroom to be sold a vehicle or enticed to purchase a warranty.

Other complaints involve being forced to give a deposit which was never returned or returned several months later; buyers also complained of being forced to purchase after-market items, such as extended warranties, as a condition to being sold the car; and buyers in several instances were told to sign documents without being shown the terms or costs; and in some cases the documents signed by the buyer contained non-cancellation clauses or a waiver of the right to complain to the Better Business Bureau or the Attorney General (see Exhibit 50 annexed to the Petition).

The complaints and affidavits are numerous enough to describe a common practice of strong-arm sales methods and unethical conduct. The buyers in many cases are older persons, unsophisticated or unfamiliar with English and each person wound up owning a car that they never intended to buy or paid a price that was dishonestly represented to them.

For example, Eugene Lamour states that he was called by one of the respondent salespeople and told he won a prize. He went to Giuffre Mazda believing he was being given a car with the prize money he won. He signed papers which resulted in Mr. Lamour purchasing a car. Mr. Lamour, who is a senior citizen and unemployed, has no drivers license. He and a friend attempted to return the car which the dealer refused to accept, and to add insult, allegedly threw the keys into the street for Mr. Lamour to retrieve (see Lamour Complaint Ex. 13 annexed to Petition).

4

Similar facts to those claimed by Mr. Lamour involve other consumers being led into the Giuffre dealerships and coerced or tricked into purchasing a vehicle (see Raynell Neal Affidavit Ex. 10; Maryse Michaud Aff. Ex. 11 and Glenn Claiborn Aff. Ex. 14).

The complaint of being induced into signing of blank documents is made in several instances. Rosita Trapp described a transaction in which she and her daughter went to Giufffre to buy a car. Ms. Trapp was given blank forms to sign at her home at 9:00 pm. Instead of being a co-signer for the car, Ms. Trapp learned that she was made the sole owner. She claims the financing application was forged by the sales person; that she was sold an extended warranty which she specifically told the dealer she did not want; and neither she nor her daughter was given a bill of sale. Ms. Trapp claims that her credit was damaged by this transaction (See Rosita Trapp Aff. Ex. 28). The allegation of having to sign blank documents is also contained in the affidavit made by Vasilos Doukas (Ex. 25), the complaint of Kafi Ayim (Ex. 26), and the affidavit of Richard Huppert (Ex. 29). In another variation, the terms of the offer were communicated to Martha Guevara in Spanish and Ms. Guevara was told to sign the documents which were in English. The terms were substantially different in the signed documents than what had been represented (See Martha Guevara Aff.(with translation) Ex. 35).

The list of grievances is extensive and unsettling. Multiple statutory violations appear in several individual transactions. The Court is struck by the similarity of the claims being made and the brazen nature of the sales persons employed by Respondent. Numerous examples exist of low sale prices being offered to buyers, and when the buyer agrees, a higher sales price is presented or financing appears to be more expensive than represented. Buyers were made to wait for hours into the evening, and rushed to close deals late at night and not given copies of paperwork or other basic protections.

Summary Judgment

A special proceeding brought pursuant to the Executive Law Sec. 63(12) or pursuant to Article 22 of the General Business Law has been determined to be the functional equivalent of a motion for summary judgment (see Matter of Port of N.Y. Auth.(62 Cortlandt St. Realty Co.), 18 NY2d 250 (1966); People v. DBM Intl. Photo Corp., 135 AD2d 353 (1st Dept. 1987). "Thus, where the petition and supporting papers contain sufficient allegations of fact to merit the relief requested and the respondents have raised no triable issues of fact by an evidentiary showing, but only assert conclusory statements in a general denial, judgment without trial is proper" Matter of People v. Telehublink Corp., 301 AD2d 1006, 1008 (citing Matter of State of New York v. Daro Chartours, 72 AD2d 872).

5

As previously discussed, the petitioner has submitted admissible proof in the form of nineteen (19) duly sworn affidavits together with fourteen (14 ) consumer complaints. Under the General Business Law Sec. 349 (h) the petitioner must show that the "defendant is engaging in an act or practice that is deceptive or misleading in a material way and that the plaintiff has been injured by reason thereof". Oswego Laborers' Local 21 Pension Fund v. Marine Midland Bank, 85 NY2d at 26. In addition, the allegedly deceptive acts, representation or omissions must be misleading to a "reasonable consumer". Goshen v. Mutual Life Ins. Co. Of N.Y., 98 NY2d 314, 324.

The allegations put forth fulfill Petitioner's obligation to make a prima facie case. False advertising has been clearly presented by the conduct of the scratch-off contest, leading to violations of GBL Sec. 350. The many instances of having buyers sign blank agreements and not giving copies of the signed agreements implicate New York Motor Vehicle Retail Installment Sales Act, Article 9 of the Personal Property Law. By requiring the purchase of after market items such as extended warranties which is alleged in many of the complaints, the Respondents have violated N.Y Ins. Law Sec. 7906 which prohibits sellers from requiring the purchase of a service contract as a condition of a loan or a condition of sale.

Respondent's Opposition to Summary Judgment

In opposing the petition and the grant of summary judgment, Respondent relies heavily on the affidavit of Peter Bellina, the general manager of Giuffre Hyundai, Ltd. (see Affidavit of Peter Bellina annexed to Respondents Cross-Motion). Mr. Bellina claims to have reviewed each of the transactions and conducted inquiries into each complaint. Beginning with the scratch-off contest, Mr. Bellina states that the scratch-off contest was discontinued in 2008 and that there should be no liability attached to claims related to the scratch-off contest. (Bellina Aff. par. "12"), The discontinuance of a fraudulent practice, however, does not preclude the Court from restraining the practice ( See State of New York v. Midland Equities of N.Y., 117 Misc.2d 203 (NY Co. 1982); Matter of State of New York v. Hotel Waldorf-Astoria Corp., 67 Misc2d 90 (NY Co. 1977)).

Mr. Bellina states that all the terms were explained to buyers or that deposits were returned to the buyers. Mr. Bellina states that buyers signed purchased warranties as a fully disclosed condition of the sale and in all other respects prices were negotiated and agreed to by the purchasers.

It is readily apparent that Mr. Bellina is without first hand knowledge of the facts involved in each transaction, and is merely recreating the transaction from reviewing the closed file. There is

6

no response offered to the over-reaching sales techniques in which buyers were visited at their homes in the evening, or given documents late in the day to sign in blank or that actual sales prices were higher or financing costs more costly than was represented to buyers.

Counsel for the Respondent, in addition to relying on the statute of limitations defense and the unsworn nature of the complaints, argues that each contract contains a merger clause which only binds the parties to the terms within the four corners of the agreement. Reliance on the merger clause in this instance is misplaced because the dispute is not a contract dispute between two parties, rather GBL claims here are based on deceptive business practices, not deceptive contracts. (See Gaidin v. Guardian Life Ins. Co. of Am., 94 NY2d 330 (1999).

Finally, the Respondent argues that John Giuffre can not be held liable for the claims brought in this petition as he is an individual and can not be held responsible for the illegal or fraudulent acts of the corporate entity. The evidence shows, however, that John Giuffre is the sole principal of each of the limited liability companies and is integrally involved in the day-to-day operations of the dealerships (See Giuffre Trans. Annexed to Petition as Ex. 51). There is ample evidence submitted with the Petition to show Mr. Giuffre's personal involvement with his businesses and sufficient legal authority to hold him responsible.

In the final analysis, Respondent has had an opportunity to respond to the credible allegations of deceptive and fraudulent business practices engaged in by the Giuffre Respondents and has offered nothing more than conclusory statements in a general denial which is insufficient to defeat an award of summary judgment (See Matter of State of New York v. Daro. Chartours, 72 AD2d 872 (3rd Dept. 1979); Matter of People v. Telehublink Corp., 301 AD2d 1006 (3rd Dept. 2003)).

Conclusion

The Court finds that Petitioner has established that Respondent has engaged in fraudulent and illegal business practices in violation of Executive Law Sec. 63(12) and deceptive acts and practices in the conduct of business as prohibited by GBL Sect. 349 and false advertising as prohibited by GBL Sec. 350. The Petitioner has also shown to this Court's satisfaction that Respondent has violated N.Y. Insurance law Sec. 7906 and the Federal Truth in Lending Act, 15 USC Sec 1601 et seq., as well as violations of the Motor Vehicle and Retail Installment Sales Act, Article 9 of the Personal Property Law.

The Court recognizes additional work will be needed to sort through the various claims and to identify the nature of each claim, and to fashion an appropriate remedy where warranted. The exact amount of restitution and damages will require a more extensive case by case review in the near future. At this time the Court orders that the Respondent be permanently enjoined from violations of Executive Law Sec. 63(12) and GBL Article 22-A Sections 349 and 350; The Truth in Lending Act, 15 USC 1601 et seq : Insurance Law Sec. 7906; and the Motor Vehicle and Retail Installment Sales Act., Article 9 of the Personal Property Law.

Respondent is also directed to render an accounting for all customers, including names and addresses, for the period October 2006 to March 2008 (i) who were mailed direct mail advertisements with scratch-off contest information and (ii) providing information as to which of those individuals purchased vehicles and (iii) the amount of said purchases.

The Respondents are ordered to make full monetary restitution to all consumers, whose identity may be disclosed after reasonable discovery, who were injured by Respondent's conduct.

The Respondent is directed to take all steps necessary to contact all credit reporting agencies, banking institutions, creditors and lenders to remove negative credit information entered against such customers of Respondent attributable to fraudulent, deceptive and illegal business practices set forth herein.

That Respondent Giuffre is directed to post cash or bond in the amount of $500,000 (which amount shall not be deemed a limitation of Respondent's overall liability), with the County Clerk of Kings County towards full restitution to be determined at such later date (i) as to each customer found to have suffered economic loss from the fraudulent, illegal and deceptive business practices of Respondent from December 2007 to the present; and (ii) to pay civil penalties in the amount of $5,000 to New York State for each instance of a deceptive act or practice or false advertising in violation of GBL Article 22-A, pursuant to GBL Sec. 350-d.

Petitioner is awarded statutory costs against each named respondent in the amount of $2,000 pursuant to CPLR Sec. 8303(a)(2) and Executive law Sec 63(12).

This shall constitute the decision of this Court. Settle order on notice.

Dated: December 7, 2011

Hon. Bernard J. Graham, Acting Justice
Supreme Court, Kings County

**HON. BERNARD J. GRAHAM**

8