# Exhibit 3

AMERICAN ARBITRATION ASSOCIATION
-----------------------------------------------------------------------X

WILLIAM J. LOVELACE and
OCTAVIA LOVELACE,

                              Claimants,                      **RESPONDENT'S**
                                                                       **PRE-HEARING BRIEF**
     - against -

                                                                            Case No.: 01-17-0006-3311

SHOWROOM AUTO, LLC,

                              Respondent.
-----------------------------------------------------------------------X

       Respondent, Showroom Auto LLC, respectfully offers the following Pre-Hearing Brief.

**Background**

       This matter involves claims under the Truth in Lending Act, under New York General Business Law §§ 349, 350, and common law fraud. Respondent is a licensed car dealer. On April 7, 2016, Claimants, William J. Lovelace and his daughter Octavia Lovelace, purchased a 2014 Mercedes-Benz from Respondent. Claimants do not assert that there is anything wrong with the car; they merely seek to re-negotiate the price they paid.

       Showroom posted an advertisement showing the basic price for the car as $23,981.00. As is typical in such situations, there were material conditions. These were clearly and conspicuously disclosed in section of the ad entitled "Vehicle Dislaimer", part of which alerted consumers that: "<u>sales prices do not include Used Vehicle Recon. Fee, Prep, Tax & DMV Fees. See dealer for details</u>." When Claimants came to the dealership, Respondent showed the car at the advertised price of $23,981.00 and made sure that they informed Claimants, as noted in the ad, the car was subject to the "Used Vehicle Recon. Fee and Prep" charge. Claimants were further informed that this charge was $2,995.00 (making for a purchase price of $26,976.00 plus tax and DMV fees).

It appears that this is the heart of Claimants' case. In that regard, Showroom was careful to make sure Claimants understood that there were additions to the advertised price. This was not only explained when they came to the dealership, but with this in mind, but repeated when they inspected the car and continued their quest to purchase it. In this regard, it is important to note that Octavia Lovelace signed an acknowledgment that the used vehicle reconditioning fee was explained to her and she "understands that it is addition to the selling price of the vehicle."

Although seemingly uncontroversial, Claimants requested an option of a Theft Deterrent Protection Plan which was priced at $2,160.00.[1] In addition, Claimants also sought a quote for financing.[2] It turned out that Ms. Lovelace had insufficient earnings to qualify (her wage statement showed she earned just $10.00 per hour). To help her out, her father said he would make the purchase in her place and the dealer's disclosed its financing fee ($1,340.00) - it takes a lot of work and the dealer incurs a fee to arrange the financing. With everything included, the cost of the transaction was:

| | |
|---|---:|
| Base Vehicle price | $ 23,981.00 |
| Used Vehicle Recon. Fee and Prep | 2,995.00 |
| Theft Deterrent Protection (Anti-theft Etch) | 2,160.00 |
| Dealer financing fee | 1,340.00 |
| Vehicle Price with Fees & Options | 30,476.00 |
| Sales Tax | 2,704.00 |
| DMV Registration Fee | 440.00 |
| Total Price Due on Delivery to Purchaser | $ 33,620.00 |

---

[1] This plan involves etching of ID numbers on critical parts of the car and window stickers to deter potential theft.

[2] Respondent does not itself finance vehicle sales but does offer financing but through third parties arrangements. Respondent collects information about creditworthiness and submits same to third party lenders to obtain underwriting clearance and pricing.

The Lovelaces spent several hours discussing the deal with Showroom. After much back and forth, they made their decision to go ahead and a purchase agreement was signed by William Lovelace at the price shown above. This sales agreement clearly and specifically acknowledges the price of the vehicle as $30,476.00 - plus NYS DMV Registration Fee and NY State sales tax - altogether totaling $33,620.00.

Claimants put down a cash deposit of $11,000.00 and financed the balance of $22,620.00. This was memorialized by a finance agreement, referred to as a "Retail Installment Contract", which was signed by William Lovelace.  Claimants agree that William Lovelace entered into the Retail Installment Contract. Complaint ¶16. Mr. Lovelace also signed a Customer Disclosure Form which states, in pertinent part:

> I, William J. Lovelace, of full age, according to law and upon my oath hereby certifies that I am purchasing a vehicle, Make <u>Mercedes Model C-300 Vin# WDDGF8AB6EA889793</u> from Showroom Auto on this date <u>4/07/16</u>. Showroom Auto has also helped me obtain financing from a third party lender, I am aware that I solely am responsible for repaying this loan to the lender and no promise was made to me by any employee of Showroom Auto and or its affiliates. Furthermore, I attest that I am not under the influence of any drugs or alcohol or any substance that would impair my ability to make a reasonable and sane decision on this day. I am signing this document with full awareness of the responsibility which I am undertaking. All aspects of the loan have been explained to me including all fees and or related charges . . .

Mr. Lovelace also signed: (a) an Odometer and Damage Disclosure Statement, (b) Retail Certificate of Sale, (c) Vehicle Registration Application, and (d) a "Customer Acknowledgment" form which requires imposes New York State law as controlling authority.  During the several hours it took to arrange all the necessary documents, Mr. Lovelace called his insurance agent and obtained an Insurance Identification Card in his own name and provided his NYS Driver's License to Respondent. Showroom was careful to make full disclosure of all fees and charges and Claimant's written acknowledgments that all charges and fees were explained and accepted.

Days after Claimants took possession, they called Showroom and asked about the price and what it included. There were telephone calls in which Claimants asked how the price got to $33,620.00. Showroom's manager explained that the "Recon. Fee and Prep" had a warranty aspect. They wanted a credit for this but Showroom explained that this protection was necessary since it was obligated to repair the car if they found anything wrong with it. Showroom offered to take the car back if they were unhappy, but Claimants demurred.

**Claims Asserted**

### 1. Truth in Lending Act

Claimants assert a violation of the Truth in Lending Act ("TILA"):

> 26. Showroom Auto violated TILA by increasing the purchase price of the Vehicle on account of William's credit and by charging him more money than he would have in a cash transaction.
>
> 27. Additionally, if a service contract was included, Showroom Auto violated ILA by not separately itemizing the cost of the service contract within the itemization of the amount financed that it provided to William.
>
> 28. Alternatively, if a service contract was included, Showroom Auto violated TILA by requiring William to charging him the cost of that undelivered contract as a condition of financing.

Treating each of the above TILA claim aspects shows that none provide a basis for relief.

**A. There was no increase in the purchase price on account of William's credit - he was not charged more than he would have paid in a cash transaction.**

First, the allegation that Mr. Lovelace paid more because he elected to finance part of the transaction[3] does not provide a basis for a TILA violation. A violation must arise out of a failure to disclose credit terms or a finance charge imposed or indirectly by the financial institution either as an incident to or as a condition of an extension of credit. Claimants make no such allegation.

---

[3]There is no disagreement that the Base Vehicle price was and remained at $ 23,981.00. The price did not change when Claimants decided to finance part of the purchase price and signed the Retail Installment Contract.

Instead, Claimants attempt to create a violation by asserting that they should not pay the part of the price included for unanticipated repairs. But this is not a disclosure issue - it's pricing based on experience in selling used cars which sometimes have repair costs which the dealer must cover. The point is Claimants do not assert any failure to disclose the terms of credit or that there was some undisclosed finance charge.

This view of TILA's reach was discussed by the Magistrate Judge's Report and Recommendation (see page 7). states:

> The purpose of the Truth in Lending Act ("TILA") is to assure meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available . . . and to protect the consumer against inaccurate and unfair credit billing and credit card practices. 15 U.S.C. §1601. To accomplish this goal, TILA requires creditors to disclose certain information and in a particular manner. TILA requires a 'lender or creditor to provide "a written itemization of the amount financed," including "each amount that is or will be paid to third parties by the creditor on the consumer's behalf, together with an identification of or reference to the third person." Pierre v. Planet Automotive, 193 F. Supp. 3d 157, 164 (EDNY 2016)(internal citations omitted).
>
> According to the regulations implementing TILA, a finance charge is "imposed or indirectly by the financial institution either as an incident to or as a condition of an extension of credit," not including any charge of a type payable in a comparable cash transaction (such as taxes, title, licenses or registration fees) 12 C.F.R. §226.4(a). Since this finance charge could be hidden in the total cost charged to a consumer, TILA "requires clear and accurate disclosures by creditors to consumers of any finance charge that the consumer will bear under the credit transaction." Diaz v. Paragon Motors, 424 F. Supp. 2d 519, 529 (EDNY 2006) see also 15 U.S.C. §1638(A)(4).

The point is that Claimants do not and cannot allege any non-disclosure of credit terms. The Retail Installment Contract explains all the fees and costs involved in obtaining financing. The Retail Installment Contract has specific TILA disclosures separated and highlighted on the first page. Moreover, there was no hidden fee(s) charged by the financier - in fact, the opposite is true; Showroom disclosed its fee $1,340.00 for its work and costs to arrange the financing and Showroom

paid the fee to obtain the financing.

**B. There was no TILA obligation to separate itemize the cost of a service contract within the itemization of the amount financed**

Despite Showroom's best efforts to explain their "warranty", the Lovelaces refuse to accept that a retailer is entitled to set his sales price to include unanticipated repairs. A reputable dealer factors in his repair obligations and this allows him to stand behind the cars he sells. If there had been a mechanical issue with the car, the Lovelaces would have expected Showroom to repair it and they not incur any charge for repairs. Whether there was a service contract included or whether the dealer was prudent to allow for a repair cost which experience has taught him to expect, the transaction was reasonable and fair.

A dealer's warranty is part and parcel of the price. Showroom's upstanding reputation is based on its experience as a dealer and its efforts to make sure its vehicles are in excellent condition and purchasers do not face repair costs during the warranty period. It is axiomatic that retailers are free to set their prices to cover their costs.

**C. It is not a TILA violation to include a service contract in the price- Claimants were not charged the cost of a service contract as a condition of financing.**

Claimants have no basis to assert that TILA is violated by a price which includes a cost factor for repairs. The price of the car remained the same whether Claimants paid cash or financed their purchase. If the price included a repair factor as part of the dealer's projected cost, it cannot rise to a violation of TILA just because the customer chose to finance his purchase.

As a result, none of the grounds asserted by Claimants are sufficient to support a TILA violation.

## 2. New York General Business Law §§ 349 & 350

As to their claims under the New York General Business Law §§ 349 & 350 ("GBL"), Claimants assert:

> 32. Showroom Auto's failure or refusal to sell the Vehicle for its advertised price is a violation of the GBL §§ 349 and 350, and it has caused Claimants to suffer an ascertainable loss of money or property in that they paid more for the Vehicle, and became indebted to a greater extent, than if they had been charged only the advertised price.
>
> 33. Additionally, William signed the Contract and agreed to be liable for the payments for Octavia's Vehicle without compensation, and he is a "Co-Signor" within the meaning of the Federal Trade Commission's Credit Practices Rule, 6 C.F.R. § 444.3.
>
> 34. Showroom Auto violated the GBL when it obligated William without first informing him of the nature of his liability as co-signor, in violation of C.F.R. § 444.3(a)(2).
>
> 35. Showroom Auto violated the GBL when it did not provide William with a copy of the Notice to Co-Signor required by 16 C.F.R. § 444.3(.c).
>
> 36. Showroom Auto further violated the New York General Business Law ("GBL") § 349 by failing to provide Plaintiff with the Buyers Order, Buyer's Guide and other contract documents for at the time he signed the Contract.
>
> 37. By and through its acts, omissions, concealments, and misrepresentations, Respondent violated GBL §§ 349 and 350 with false and deceptive advertising and with materially misleading and consumer-oriented deceptive acts and practices, with a broad impact on consumers at large, and did so knowingly or willfully.
>
> 38. Plaintiffs relied upon the false and deceptive advertising.

Essentially, Claimants urge that Showroom failed to sell the car for the "advertised price" and state that this is a violation of GBL §349 and §350. They also assert that Mr. Lovelace was a co-signor. Neither of these claims are fair or reasonable under the circumstances. A reasonable consumer would not be likely to be misled by the advertisement and there was no misrepresentation since the ad contained a conspicuous Vehicle Disclaimer. Mr. Lovelace was not a co-signor, he was the purchaser.

GBL § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." GBL § 350 prohibits "[f]alse advertising in the conduct of any business, trade or commerce or in the furnishing of any service in this state." To assert a claim under either section, "a plaintiff must allege that a defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice." *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (citing *Koch v. Acker, Merrall & Condit Co.*, 18 N.Y.3d 940 (2012).

To establish that conduct is materially misleading, a consumer must demonstrate that a reasonable person would likely be misled by the alleged misrepresentation. See *Orlander*, 802 F.3d at 300 ("[T]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'"(quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007); *Spagnola v. Chubb Corp.*, 574 F.3d 64, 74 (2d Cir. 2009) (stating that a plaintiff must show that the act complained of was likely to "mislead a reasonable consumer acting reasonably under the circumstances").

Courts have set a standard which looks to the context of the advertisement. *Fink v. Time Warner Cable*, 714 F.3d 739, 742 (2d Cir. 2013)("[I]n determining whether a reasonable consumer would have been misled by a particular advertisement, context is crucial"); see also *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 53 (E.D.N.Y. 2015) ("Courts view each allegedly misleading statement in light of its context on the product label or advertisement as a whole. The entire mosaic is viewed rather than each tile separately"); *Koenig v. Boulder Brands, Inc.*, 995 F. Supp. 2d 274, 288 (S.D.N.Y. 2014) ("[I]n resolving the reasonable consumer inquiry, one must consider the entire context of the label"); *Ackerman v. Coca–Cola Co.*, No. 09-CV-0395, 2010 WL 2925955, at *15

(E.D.N.Y. July 21, 2010) (conducting the reasonable consumer analysis by "[v]iewing each allegedly misleading statement in light of its context on the label and in connection with the marketing of [the product] as a whole").

The reasonable consumer determination is a question of fact. *Hidalgo v. Johnson & Johnson Consumer Cos., Inc.*, 148 F. Supp. 3d 285, 295 (S.D.N.Y. 2015); see *Quinn v. Walgreen Co.*, 958 F. Supp. 2d 533, 543 (S.D.N.Y. 2013) ("[W]hether a particular act or practice is deceptive is usually a question of fact"); *Sims v. First Consumers Nat'l Bank*, 758 N.Y.S.2d 284 (App. Div. 2003); *Wilner v. Allstate Ins. Co.*, 893 N.Y.S.2d 208, 217 (App. Div. 2010) (noting that consumer reasonableness was a question of fact).

Showroom presents ample proof that none of the statements in its advertising would deceive a reasonable consumer because: (1) the representations about the price and the sale conditions - particularly the used vehicle reconditioning fee are not false, as alleged by Claimants, (2) Ms. Lovelace signed a statement confirming that the used vehicle reconditioning fee was explained to her in person and because of this, the price paid does not reasonably render false the statement that the used vehicle reconditioning fee is an addition to the price; (3) no reasonable consumer could interpret the base price as the final price because of Showroom's use of a Vehicle Disclaimer advising that the price did not include a used vehicle reconditioning fee, and (4) Claimants have not show, as alleged, that they were deceived

In fact, Claimants do not even allege that they were subject to practices that were "likely to mislead a reasonable consumer acting reasonably under the circumstances." [Report and Recommendation at 8 (citing *Horowitz v. Stryker Corp.*, 613 F. Supp. 2d 271, 286 (EDNY 2009)]. The advertised base price did not change. All fees and costs were either disclosed, elected or mandated. Claimants have no issue with the vehicle and did not accept Showroom's offer to accept

return the vehicle.

Under the circumstances, Claimants GBL claim is completely conjured and appears as an effort to extract a discount from Showroom from the negotiated price of the vehicle. Claimants GBL claim must be denied.

3. **Common Law Fraud**

As to their claims for COMMON LAW FRAUD, Claimants assert:

> 40. Showroom Auto's agents intentionally, recklessly and/or negligently made misrepresentations to Plaintiffs regarding the price of the Vehicle and the amount they would be financing to purchase the Vehicle.
>
> 41. Showroom Auto's agents negligently, willfully, intentionally and/or recklessly concealed from the Plaintiffs the fact that the Vehicle was going to be considerably costlier to them than was represented, and that it had created a contract containing more expensive terms than had been agreed to.
>
> 42. Showroom Auto then assigned the contract with an inflated price to Exeter and, based upon that assignment, arranged with the New York Department of Motor Vehicles to issue a title that reflected a lien in favor of Exeter.
>
> 43. That in reliance on Showroom Auto's false representations as set forth in the foregoing paragraphs, Plaintiff William Lovelace entered into a financing contract with Showroom Auto.
>
> 44. Without Showroom Auto's false representations, Plaintiff William Lovelace would not have entered into the financing contract with Showroom Auto.
>
> 45. Plaintiff William Lovelace has been actually damaged by Showroom Auto's false representations by receiving an automobile loan at a higher price for the Vehicle and amount financed than what William and Octavia Lovelace agreed to in negotiating the Contract.
>
> 46. Plaintiff William Lovelace has also been actually damaged by Showroom Auto's assignment of the contract to Exeter and by causing a lien with a grossly inflated price to be placed in Exeter's name.
>
> 47. Plaintiff William Lovelace relied on Showroom Auto's misrepresentations and were induced to purchase the aforementioned automobile.
>
> 48. Plaintiff Octavia Lovelace was also damaged by these false representations, because – as Defendant was aware – William Lovelace was buying the Vehicle in

>his name at Defendant's suggestion and Octavia Lovelace is responsible for making the monthly payments on his behalf.
>
>49. As a result of the aforementioned conduct, Plaintiffs suffered damages.
>
>50. Showroom Auto's actions as hereinbefore described were reckless, outrageous, willful, and wanton, thereby justifying the imposition of exemplary, treble and/or punitive damages.

In essence, this claim is that somehow Showroom "concealed" the "real" price and it was "costlier to them than was represented". This is simply not the case and the Court, in reviewing this claim, found it was unsupported by the facts. The Court's Report and Recommendation found:

> Claimants do not expressly allege fraud and misrepresentation, they claim that William was "rushed" to sign the contract, implying that he was somehow misled or did not become aware of the Contract's terms. (Complaint ¶¶ 21-22). Under New York law, a plaintiff claiming fraud in the course of a contract must prove by clear and convincing evidence, a material misrepresentation or omission of fact made knowingly by the defendant with the intent to defraud, the plaintiff's reasonable reliance, and the resulting damage. See e.g. Bank of America v. Bear Stearns, 969 F. Supp. 2d 339 (SDNY 2013) . . . In the Lovelace's case, there are no facts alleged suggesting that defendant made a misrepresentation or omitted any information relevant to the arbitration agreement that would induce them to sign the agreement in reliance thereof . . . The record is devoid of any facts that would suggest fraud or misrepresentation in the signing of the Contract . . .

*Id.* at 14.

A claim for fraud under New York law requires a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages. See e.g. *Shareholder Representative Services LLC v. Sandoz Inc.*, 2015 NY Slip Op. 50326 (Sup. Ct., NY County - Commercial Div. 2015). Claimants do not state that any representation by Respondent was false. The base price was exactly what was advertised and there was no failure to disclose by Respondent. Claimants signed multiple acknowledgments and there was nothing concealed from them.

Under the circumstances, it is hard to place any credibility it Claimants assertion that Respondent fallsely "create[d] a contract containing more expensive terms than agreed" - the

contract contained the exact terms as agreed to by the parties.

Moreover, to satisfy the scienter element of a fraud claim, Claimants must show that purported misrepresentations were false when made and that Respondent and its agents intended to induce Claimants into the transaction based upon their misrepresentations and omissions. Claimants ignore this aspect and do not identify any misrepresentations intended to induce reliance.

In short, Claimants do not assert any facts from which it is reasonable to infer that Respondent knew at the time that any statements were false or made with the intent to deceive. There were no misrepresentations by Respondent to Claimants regarding the price or the amount they financed. Claimants cannot support that a fraud occurred and this claim must be denied.

**Counterclaim**

Showroom believes that the Lovelaces have asserted their claim without good faith basis and in a wrongful attempt to renegotiate a fair and reasonable used car purchase transaction. Obviously, all or parts the claim are frivolous under New York law. Because of this Showroom, seeks a finding to that effect and requests reimbursement. The Arbitration provision of the Retail Installment Contract, reads, in part:

> We will pay your filing, administration, service or case management fee and your arbitrator or hearing fee all up to a maximum of $5,000, unless the law or the rules of the chosen arbitration organization require us to pay more. The amount reimbursed in whole or in part by decision of the arbitrator if the arbitrator finds that any of your claims is frivolous under applicable law. Each party shall be responsible of its own attorney, expert and other fees, unless awarded by the arbitrator under applicable law.

Respondent Showroom has and will incur administrative costs and attorneys fees which it otherwise would not have incurred but for the wrongful claims asserted by Claimants. As a result of the foregoing, Respondent Showroom seeks reimbursement in an amount to be determined by the Arbitrator.

**Conclusion**

At hearing, the evidence will show that under the circumstances, Showroom acted in a commercially reasonable manner and the within claim has been interposed in a wrongful attempt to use litigation as a tactic to cause Respondent to renegotiate a transaction which was fair and reasonable when it was consummated. It further appears that all or some of the claims are plainly frivolous under New York law.

Respondent Showroom has asserted a counterclaim because it has and will incur administrative costs and attorneys fees which it otherwise would not have incurred but for the wrongful claims asserted by Claimants. As a result, Respondent seeks reimbursement thereof.

WHEREFORE, Respondent respectfully asks for an award; (a) dismissing the Claim in its entirety; (b) on the Counterclaim, granting reimbursement of costs and expenses incurred in the defense of this matter, or such parts thereof as may be found to be frivolous and therefore without basis in law or fact; and (c) such other and further relief as the Arbitrator deems just and proper.

Dated: Brooklyn, New York
July 27, 2018

Yours, etc.,

_____
Steven M. Coren, Esq,
Coren Law Group PC
Attorneys for Respondent
Showroom Auto LLC
225 Union Street
Brooklyn, NY 11231
(212) 371-5800
scoren@corenlawgroup.com